**SACO DEFENSE SYSTEMS DIVISION, et al., Plaintiffs,**

v.

**Caspar W. WEINBERGER, et al., Defendants,**

and

**Beretta, U.S.A., Intervenor.**

**Civ. No. 85–0082 P.**

United States District Court, D. Maine.

Feb. 20, 1986.

Leigh S. Ratiner, Dickston, Shapiro & Morin, Washington, D.C., Ralph I. Lancaster, Pierce, Atwood, Scribner, Portland, Me., Josephine L. Ursini, Washington, D.C., for plaintiffs.

Richard W. Oehler, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., F. Mark Terison, Asst. U.S. Atty., Portland, Me., for defendants.

Thomas B. Wheatley, Perkins, Thompson, Hinckley & Keddy, Portland, Me., for intervenor Berretta-USA Corp.

## OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

GENE CARTER, District Judge.

In this action Plaintiffs, disappointed contract bidders, seek to have the Court set aside an award of a contract for production of 9mm handguns by the Defendant to intervenor. This Court denied Plaintiffs' motion for a preliminary injunction on April 8, 1985, 606 F.Supp. 446. The case is now before the Court on cross-motions for summary judgment. Under Fed.R.Civ.P. 56(c), a court may grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Using the standard set forth in *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), the Court has determined that there remain no genuine issues of material fact and that for the reasons stated below Defendants are entitled to judgment as a matter of law.

### Standard of Review

In its order denying Plaintiffs' motion for a preliminary injunction, the Court described at length the very limited standard of review to be applied by a court reviewing a procurement contract. *See Saco Defense Systems Division, Maremont Corp. v. Weinberger*, 606 F.Supp. 446, 450 (D.Me. 1985). In order to prevail a disappointed bidder must show that the awarding agency's decision "had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations." *Smith & Wesson v. United States*, 782 F.2d 1074, 1078 (1st Cir.1986); *Princeton Combustion Research Laboratories, Inc. v. McCarthy*, 674 F.2d 1016, 1019 (3d Cir. 1982). Moreover, in determining whether the agency's decision had a rational basis, the court's

inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. Such discretion extends not only to the evaluation of bids submitted in response to a solicitation, but also to determinations by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements.... If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.

*Saco Defense*, 606 F.Supp. at 450–51 (*quoting M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971) ).

## Plaintiffs' Rule 56(f) Discovery

Plaintiffs raise several specific challenges to the rationality of the procurement process, some of which were not brought forward in the initial complaint but are, instead, the product of the discovery allowed by this Court in its order of October 4, 1985. Defendants argue that much of the discovery was outside the scope of the Court's order and that matters so raised should not be considered by the Court. The Court's order granted discovery under Fed.R.Civ.P. 56(f) only on the limited issue of the Army's application of a ten percent cost factor to Beretta's spare parts. When discovery appeared to stray from that ordered by the Court, Defendants objected and were assured by Plaintiffs that Plaintiffs were only seeking information which would reasonably lead to relevant information on the permitted topic. Plaintiffs insisted in their submission to this Court on the Rule 56 motion and in later responses to Defendants' discovery objections, that their concern was the application of the ten percent factor and nothing else. Nevertheless, the current motion challenges the rationality of the ten percent factor, application of the quality assurance factor, and alleged arbitrariness of the Source Selection Authority as well as application of the ten percent factor.

There is authority for the proposition that the Court should consider all materials submitted by the parties on a motion for summary judgment rather than confining itself to issues raised in the pleadings. *See* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2721 at 43 (1983). However, the issue is obscured in this case by the allegations that the discovery materials presenting the new challenges to the procurement process were the result of a discovery violation. The Court need not now address Defendants' claims that Plaintiffs should not be allowed to assert new challenges because it is clear that all of the challenges are without merit.

## Rationality of the Ten Percent Factor

The first challenge raised by Plaintiffs deals with the ten percent factor applied by Defendants to spare parts in order to estimate the cost of spare parts in the contract. Since spare parts had not previously been included in the price competition for weapons contracts, Defendants established a formula to estimate their cost for the life of the contract. Under the formula, estimated spare parts cost for either offeror equals ten percent of the total number of handguns to be purchased (31,593) times the sum of the costs of individual spare parts to be provisioned for the weapon.

■ The Court finds that Plaintiffs have waived this issue. Protests alleging defects in the solicitation which are apparent prior to bid opening or the closing date for receipt of proposals must be filed by that time. 4 C.F.R. § 21.2(b)(1) (1984); *Self-Powered Lighting Ltd. v. United States*, 492 F.Supp. 1267 (S.D.N.Y.1980). A draft of the solicitation was given to prospective bidders, including Plaintiffs, in March 1984. The draft included sections L and M, which make clear that cost of spare parts will be evaluated and instruct bidders how to price spare parts using the ten percent factor for purposes of evaluation. A meeting was held to discuss the solicitation with prospective bidders. A summary of that meeting distributed to all present, including Plaintiffs, again stated that spare parts cost would be evaluated using the ten percent formula. Plaintiffs did not protest the use of the formula until late January 1985, after Defendants announced that Beretta had won the contract.

From the draft solicitation, meeting, and meeting summary, Plaintiffs knew or should have known that spare parts cost would be evaluated using the ten percent factor.[1] If they had wanted to challenge the ten percent factor, they should have done it before the close of the bidding, at a time when its correction, if necessary, could have been effected without necessi-

---

1. *See infra* at 390–91 and footnote 3.

tating the undoing of all the spare parts cost evaluation performed by Defendants.

Even if Plaintiffs' challenge were timely, the Court finds it unpersuasive. Plaintiffs argue that the ten percent factor is irrational because it "was literally pulled out of thin air by Lt. Col. Roddy." Plaintiffs' memorandum at 13. However, Lt. Col. Roddy, the project manager who oversaw the 9mm handgun procurement program, had had both training and experience in procurement. His deposition, affidavits and information paper make clear that his selection of the ten percent factor was "the result of a *considered process*, rather than an arbitrary and capricious choice based on factors lacking *any* intrinsic rational basis or relationship to the questions at issue." *Keene Corp. v. United States*, 584 F.Supp. 1394, 1401 (D.Del.1984) (emphasis in original).

Lt. Col. Roddy explained that because the 9mm handgun was a new weapon, Defendants had no experience from which they could predict the actual number of spare parts they would need. Roddy Deposition at 140. He therefore sought information from the Army Materiel Management Directorate about how the Army estimates the cost of repair parts for new weapon systems. He was told that the Army historically has budgeted these costs for the first two years of a contract to be fifteen percent of the end item value; i.e., fifteen percent of the total cost for the weapon. Roddy Deposition at 121–22; Plaintiffs' Exhibit 11.

Lt. Col. Roddy adapted this formula to meet certain special requirements that he and others perceived in this weapons contract. First, they had determined that they wanted to assure the lowest possible price for spare parts by including spare parts in the bid competition for the first time. Estimating spare parts cost based on a percentage of the cost of the weapon does not foster competition on the spare parts themselves. Therefore, Lt. Col. Roddy applied the percentage estimate instead to the number of weapons to be purchased. Roddy Deposition at 113–14, 134–45. The

chairmen of both the Selection Source Advisory Committee and the Selection Source Evaluation Board were consulted by Lt. Col. Roddy and participated generally, but not specifically, in the determination of the formula that was ultimately used. Johnson Deposition at 122–26, 140; Beckmann Deposition at 114–15, 123.

Similarly, Lt. Col. Roddy's choice of the ten percent figure was adapted from the fifteen percent historical budgeting figure suggested by the Army Materiel Management Directorate and was not pulled out of thin air. The figure represented Lt. Col. Roddy's conservative estimate of the needs of this five-year procurement compared to the two-year estimates done by the directorate. As Roddy explained in his information paper:

3. The 10 percent pricing and evaluation factor was developed based upon this Command's experience and best judgment. Historically, repair parts have been budgeted at approximately 15 percent of the end item value for a period of approximately two years. (10 percent for initial issue parts and 5 percent for the replenishment parts.) After the two year period, the initial issue percentage (10 percent) is recomputed based on ASL/PLL Distribution Plan data; replenishment (5 percent) is determined from actual demand data. A conservative estimate of the composite *five year* repair part acquisition is 10 percent, with actual requirements possibly running slightly higher. (Based on two years at 15 percent and three years determined by actuals).

Plaintiffs' Exhibit 11. (Emphasis added.)

Although the ten percent figure was chosen by Lt. Col. Roddy without the specific knowledge of the other procurement personnel as to its basis, the record demonstrates that Lt. Col. Roddy was, beyond any rational question, the appropriate person to make the spare parts estimate and that he was more than adequately qualified to do so. Defendants have also demonstrated that Roddy's decision was a con-

sidered exercise of his discretion, informed by his considerable expertise.

Plaintiffs contend that Defendants' claim that they could not know actual parts requirements for the 9mm handgun in advance is specious and that there were alternative methods for providing more accurate estimates of actual spare parts needs. Plaintiffs further suggest that the Defense Acquisition Regulation 1–1201 requires the Army to state actual projected needs in the solicitation. DAR–1–1201 provides that specifications for acquisitions

> shall state *only* the actual minimum needs of the Government and describe the supplies and/or services in a manner which will encourage maximum competition and eliminate, insofar as possible, any restrictive features which might unnecessarily limit acceptable offers to one supplier's product, or the products of a relatively few suppliers.

(Emphasis added.) The Court cannot agree with Plaintiffs' construction of the regulation. It was plainly designed to foster competition by preventing procuring agencies from overstating requirements or designing the specifications of a procurement to favor one supplier or another. The regulation does not mandate that the procuring agency estimate the actual minimum number of spare parts that will be needed if, in its discretion, it has determined that it cannot adequately do so. In later, less general language, the regulation itself so indicates:

> Tailoring is the process by which individual provisions (sections, paragraphs or sentences) of the selected specifications, standards and related documents are reviewed and modified so that each one selected states only the minimum requirements of the government. Such tailoring need not be made a part of the basic specification or standard, but will vary with each application dependent upon the nature of the acquisition.

Although there may have been other methods of determining procurement needs on which spare parts cost estimates could have been based, Defendants have demonstrated that there was reason for concern about the reliability of the proposed alternatives. *See, e.g.,* Roddy Deposition at 139; Beckmann Deposition at 116; Roddy Deposition at 253; Carlstrom Deposition at 101–02. This lack of reliability is affirmed by Seth Bredbury, Plaintiffs' expert, who proposed the alternatives in his affidavit, but acknowledged that "each of these methods has some drawbacks." Bredbury Affidavit, ¶ 9.

Defense Acquisition Regulations vest a wide degree of discretion in the procuring agency in methods of cost analysis. DAR 3–807.1(d) provides that the methods and degree of the analysis are "dependent on the facts surrounding the particular procurement and pricing situation." Here the contracting officer, or more precisely, his deputy, Lt. Col. Roddy, has exercised his discretion to formulate a method of cost analysis given the salient facts of this procurement: competition on spare parts price was desired but Defendants had had no prior experience with 9mm handguns on which to base estimates of spare parts needs. The Court offers no opinion on whether the alternatives proposed by Plaintiffs would have provided satisfactory bases for the required estimates. Even if they had, however, the Court must not succumb to any temptation to substitute its own judgment for that of the contracting officer. *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 435 (3d Cir.1979).

### Application of the Ten Percent Factor

Plaintiffs argue next that Defendants did not apply the ten percent factor equally to all competitors. Specifically, they assert that because Beretta's front sight and breechblock were integral parts of the Beretta slide, the slide should have been counted as a spare part four times: once for the slide itself; once for the front sight; once for the breechblock; and once for the extra front sight that Defendants had included on the provisioning list for Saco.

Plaintiffs' argument here seems inextricably intertwined with its argument on the first point. They suggest that more

slides should have been included on the provisioning list in order to give an accurate cost estimate for spare parts. The reason for this, they assert, is that they know, and Defendants should know, that more slides will be needed to cover breakage in any of their component parts. The provisioning lists on which the cost analyses were based were designed to describe only which parts of the weapon would be stocked, not the specific quantities. The Court has determined that Defendants' cost evaluation method was rational even though it used the provisioning list and the ten percent factor rather than a formula based on actual frequency of repair or replacement of spare parts.

The consolidation of Beretta's front sight and slide was considered a weak point by some of the Defendants' evaluators, *see, e.g.,* Plaintiff's Exhibit 4 at E–3, and Plaintiffs argue that the compartmentalized evaluation procedure did not permit proper evaluation of this important fact. The weakness was noted in both the SSEB and SSAC Reports. It is clear, however, that this information was not required to be included in the cost analysis in any form. Procuring agencies are free to determine the manner in which proposals will be evaluated, and selection officials have broad discretion in determining how they will use technical or cost evaluation results. *See Prudential-Maryland Joint Venture Co. v. Lehman,* 590 F.Supp. 1390, 1404 (D.D.C. 1984) (*citing SETAC, Inc.,* B–209485, July 25, 1983, 83–2 CPD ¶ 121 at 10, and *Jonathan Corp.,* B–199407.2, Sept. 23, 1982, 82–2 CPD ¶ 260 at 2).[2]

There is no basis to dispute that the ten percent factor was known by both bidders in advance and that it was mechanically applied in a manner that was fair and impartial. Plaintiffs suggest in a footnote that Defendants violated the law because they did not list the ten percent factor in Section M of the Request for Proposals, which set forth evaluation factors. Section L of the Request for Proposals, entitled "Instructions, Conditions and Notices to Offerors," instructed bidders to list and price each and every weapon piece part on a catalog fixed price basis, and further informed them that component part quantities for pricing purposes would be based upon ten percent of the annual major item quantity with exceptions for magazines and multiple use items.

Section M adequately sets forth the evaluation criteria by stating that cost and five other factors would be evaluated. Section M made plain that cost would include the total cost of, *inter alia,* hardware items *and* spare parts. The procurement agency must disclose the evaluation factors. It need not, however, disclose the evaluation method or procedure which it will use. *Ridgeway Electronics, Inc.,* B–199557, 81–1, CPD ¶ 21 at 59 (1981). In this case, however, all bidders *were* informed of the formula to be used in Section L2(a)(2) of the Request for Proposals.[3] If the Army had changed its announced method of evaluation and counted four Beretta slides, Beretta might have had grounds for protest, *see Smith & Wesson,* at 1080, but that is not the case. Here, all bidders knew of the

---

**2.** The Court notes that there is a dispute over the actual cost of the Beretta slide and the effect that the addition of extra slides would have had on the relative ratings of the two bidders. The Court further notes that this issue of fact is not material because such hypothesizing is essentially useless. If Defendants had decided to base costs on actual needs requirements, it is equally conceivable that extra parts would have been required for the Saco weapon as well. Saco's weapon includes nine fewer parts than Beretta's and it is possible that some of them serve the function of two or more Beretta parts or that some of them are more likely to break due to their design or positioning.

**3.** In his affidavit, the president of Saco states that he misunderstood the solicitation and would have submitted different prices if he had known that Defendants would not evaluate spare parts cost on need but instead would mechanically use the formula set forth in section L. This assertion is not supportable since section L.2.a.(3) specifically states: "Offerors shall extend the catalog unit prices and price the entire Procurement Method One and Procurement Method Two lot of spares as a total price *for evaluation purposes* using the 10 percent and 400 percent quantity factors of the total contract weapon quantity." (Emphasis added.)

applicable factors, and everything in the record indicates that the evaluation factors and the ten percent cost formula were applied identically, and as announced, to the spare parts prices submitted by the offerors.

### Negotiations With Bidders

Plaintiffs also argue that Defendants violated DAR 3–805.1 and DARCOM Pamphlet 715–3, which require negotiations with all offerors within a competitive range. The regulation, however, provides a pertinent exception:

[T]his requirement need not be applied to procurements:

(v) in which it can be clearly demonstrated from the existence of adequate competition ... that acceptance of the most favorable initial proposal without discussion would result in a fair and reasonable price, provided, however, that the solicitation notified all offerors of the possibility that award might be made without discussion, and provided that such award is in fact made without any written or oral discussion with any offeror.

DAR 3–805.1.

■ The only rationally supportable conclusion to be reached on this record is that adequate competition took place. The field was narrowed from eight to two before proposals were submitted, and the SSAC report establishes that the bids from the two offerors were very close and that either weapon could satisfactorily have been chosen. SSAC Report, Exhibit 4, at 7; *see*

also *Sun Ship, Inc. v. Hidalgo*, 484 F.Supp. 1356, 1371 (D.D.C.1980). Moreover, the Defendants determined that the contract falls within this exception allowing award without negotiations, and their reasonable interpretation of their own regulations is entitled to considerable judicial deference. *Sun Ship, Inc. v. Woolsey*, 484 F.Supp. 1348, 1356 (D.D.C.1979). Once adequate competition has been demonstrated, it is only necessary that the solicitation meet the requirements of the regulation's proviso by informing offerors that an award may be made without discussion. The Request for Proposals under discussion here did exactly that in Section L(1)(c)(2).[4]

Relying on *Windham Power Lifts, Inc./Quality Plus Equipment, Inc.*, B–2142187, March 7, 1984, 84–1 C.P.D. ¶ 278 at 2, Plaintiffs assert that the exception applies only when awards are made on the basis of initial proposals, without discussions and best and final offers. In this case, the request for proposals called for submission of technical proposals by July 20, 1984, and submission of cost proposals by October 9, 1984. Both Beretta and Saco submitted these proposals. On November 20, 1984, Defendants issued amendment 3 to the RFP, which incorporated "mandatory program changes" and directed that best and final offers be submitted by December 11. *See* Exhibit 4 at 2.[5] Both parties received the amendment and submitted their offers by the prescribed date. Beretta amended its cost proposal in light

---

4. Plaintiffs contend that the failure to negotiate harmed their score because there was a discrepancy in their rating for quality assurance that would have been resolved if discussions were held. There were widely divergent ratings on this factor by different evaluators on the Source Selection Evaluation Board. The Chairman of that board questioned the scores which were then reaffirmed. He passed all the information along, adding his opinion that the weaknesses were not critical and could be corrected. The Source Selection Advisory Council also noted the variance in quality ratings, and its chairman reported to the Source Selection Authority that he did not feel a large variation was justified and that Saco had an excellent quality history. He noted, however, that Beretta should be given some consideration for its effort in submitting

its original Quality Assurance Plan in accordance with the government request. SSAC Report at 7. Therefore, although Plaintiffs argue that the parties would have had equal quality scores if negotiations had taken place, that is not shown to be the case.

All of the pertinent information was submitted to the Source Selection Authority who was free to choose whichever candidate he wished. He took all of the information into account and chose Beretta.

5. The Court infers from the report that the mandatory program changes refer to a change in the quantity of guns to be purchased. See SSAC, Report, Exhibit 4, at 5.

of the increased delivery quantities set forth in amendment 3; Saco did not.

Plaintiffs now argue that initial offers were made on July 24 and October 9 and that Defendants had to conduct negotiations unless, pursuant to the exception, they accepted these offers. There are two ways in which one might view this factual situation, neither of which gives rise to a finding that Defendants acted improperly. One way of conceptualizing the facts here is to find, as Defendants apparently did, that the RFP only became complete with the issuance of Amendment 3, which incorporated mandatory program changes and required receipt of best and final offers by December 11. Under this scenario, the offers submitted on December 11, although termed best and final offers, were actually the initial offers to the *completed* RFP. The solicitation had warned that bids might be considered without further discussion and that is precisely what occurred, as permitted by the exception found in DAR3–805.1.

It is also possible to characterize Amendment 3 as a type of negotiation with the parties. In the treatise on negotiated procurement law relied on by Plaintiffs, author Andrew Gallagher states:

> [I]n the key decision in 51 Comp.Gen. 479 (1972), the Comptroller General, reviewing a number of prior decisions, stated that the ultimate test of whether discussions have been conducted is whether an offeror has been afforded an opportunity to revise or modify its proposal, regardless whether such opportunity resulted from action initiated by the Government or the offeror.

A. Gallagher, The Law of Federal Negotiated Contract Formation (1981) at 201; *see also Sun Ship, Inc. v. Hidalgo*, 484 F.Supp. at 1372.

Obviously, by Amendment 3 both parties were afforded the opportunity by the Government to revise or modify their proposals. As the Gallagher treatise points out, requests for best and final offers may be sufficient to satisfy the requirement for meaningful discussion in certain circumstances. *Id.* at 206. Plaintiffs argue that they should have been permitted to negotiate various weaknesses in their proposal before submitting best and final offers. While the Court agrees that in certain instances bidders should be afforded an opportunity to discuss weaknesses or deficiencies in their proposals, it is also clear that "there is no general requirement to discuss all inferior aspects of an otherwise technically acceptable proposal ... whether a given inadequacy should be discussed depends on its nature." *Id.* at 208. Here, the Court finds as a matter of law that there was no need for Defendants to point out and discuss the bidders' weaknesses because those weaknesses were very minor. Defendants determined that either bidder would provide a high quality weapon. *See* SSEB Rep.Ex. 5 at 3; SSAC Rep., Ex. 4 at 7.

Both proposals had weak points but none, including the quality assurance plan with which Plaintiffs are so concerned, were critical, *see id.*, and they did not impair the overall suitability of either weapon. No discussions of weaknesses were needed or held with either party. Discussions, in their broad sense, were held with both bidders by the request for best and final offers. Following these "discussions," according to the regulations, Defendants considered not the initial proposals, submitted in October, but the best and final offers submitted by the bidders on December 11. Even though Plaintiffs did not modify their initial offer as Beretta did, the two were treated identically and had the same competitive opportunities. In either instance both bidders were treated equally and fairly and Defendants did not act contrary to applicable statutes and regulations.

### Discretion of Source Selection Authority

■ Finally, Plaintiffs argue that the Source Selection Authority abused his discretion because he considered cracks that appeared in Plaintiffs' weapon in tests at 7000 rounds. The mandatory standard

which each weapon was required to pass was 5000 rounds without a failure. The Source Selection Evaluation Plan stated that a service life of 10,000 rounds was desirable.

Plaintiffs have provided no evidence which would suggest that the Source Selection Authority acted improperly in considering the frame failures. The Request for Proposals made clear that as part of the technical suitability factor Defendants could evaluate the extent to which each weapon exceeded RFTS qualifications. Exhibit 7, § M.1.3.a. In the technical suitability evaluation, the same several "desirable" standards were considered for each weapon by the SSEB and the SSAC as well as the Source Selection Authority. *See* SSEB Report, Exhibit 5, at C–34, C–89. Saco was not penalized for the frame failures past the mandatory standard; it received extra credit for its performance past 5000 rounds. Beretta received more credit because of its better performance.

Plaintiffs cannot seriously argue that the Source Selection Authority should not have considered durability. In a procurement of this sort, it is clearly a reasonably based consideration, bearing on technical suitability and, indirectly, on cost. Moreover, the record demonstrates indisputably that the SSA considered durability only in conjunction with his consideration of all the appropriate factors:

> Selection was made considering cost, logistics, technical suitability, production, quality, and management capability. Also as a result of Best and Final offers, the selected weapon is the low estimated overall evaluated cost offer and provides potential further savings during the life of the weapon due to durability.

Source Selection Decision Memorandum, Defendants' App. at 14. The Source Selection Authority had ultimate responsibility for choosing which weapon would be purchased. Indeed, when the task presented itself, he had to choose between weapons which had both met all requirements and were both considered suitable. Using considerations of initial cost and potential sav-

ings through durability to distinguish between two similarly qualified candidates cannot be said to be irrational or arbitrary especially given the wide latitude afforded contracting officers for the exercise of their informed discretion. *Sea-Land Services, Inc. v. Brown,* 600 F.2d at 433.

On this record all of Plaintiffs' suggestions that Defendants acted irrationally or unfairly are wholly without merit. While Plaintiffs may disagree with the results of the bidding process, all bidders had identical, adequate information to allow them to bid effectively. The evaluation was designed and conducted in a manner which would achieve the laudatory public goals of treating each applicant fairly while encouraging competition on spare parts and fostering cost savings for the Government.

As a postscript the Court will note that even if it had found the procurement irrational in some respect, *e.g.,* if it had found that Defendants should have counted Beretta's slide four times, it would not have granted an injunction in this case. *See Princeton Combustion Research Laboratory v. McCarthy,* 674 F.2d at 1022. In exercising its discretion as to whether or not to grant an injunction in a procurement case the Court must balance three factors:

> the practical considerations of efficient procurement of supplies for continuing government operations, the public interest in avoiding excessive costs and the bidders' entitlement to fair treatment through adherence to statutes and regulations.

*Id. (quoting Sea-Land Services, Inc.* 600 F.2d at 434). Here it is clear from the calculations done by Plaintiffs that even if they had prevailed on some of the issues raised, their ratings would still have left them very close to Beretta. The evaluations still would have found either weapon suitable, and the difference in cost between the two would not have been significant enough to outweigh the cost of stopping a contract which has been ongoing since April and which, with the related expenditures, already has cost the Government between fourteen and twenty-four million

**394**

dollars.[6] Since invalidating the contract could neither procure a better weapon nor protect the public fisc, the Court would find that these considerations outweigh the harm to Plaintiffs occasioned by the hypothetical irrationality in the procurement process. That harm, if it had occurred, could best be redressed by the award of bid preparation costs.

Accordingly, it is ORDERED that Plaintiffs' Motion for Summary Judgment be, and it is hereby, DENIED. Defendants' Motion for Summary Judgment is hereby GRANTED, and the Complaint is hereby DISMISSED.