**SACO DEFENSE SYSTEM DIVISION, et al., Plaintiffs, Appellants,**

v.

**Caspar W. WEINBERGER, Secretary of Defense, et al., Defendants, Appellees.**

No. 86–1392.

United States Court of Appeals, First Circuit.

Argued Sept. 12, 1986.

Decided Dec. 3, 1986.

Richard J. Conway, with whom Leigh S. Ratiner, Paul R. Taskier and Dickstein, Shapiro & Morin, Washington, D.C., were on brief, for plaintiffs, appellants.

Richard W. Oehler, Commercial Litigation Branch, Civil Division, Dept. of Justice, Washington, D.C., with whom Richard S. Cohen, U.S. Atty., Augusta, Me., David M. Cohen, Director, and E. Lamar Battles, Office of the Judge Advocate General, Dept. of the Army, Washington, D.C., were on brief, for the U.S.

Thomas B. Wheatley, with whom John A. Hobson and Perkins, Thompson, Hinckley & Keddy, Portland, Me., were on brief, for Beretta U.S.A. Corp.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiff-appellant Saco Defense System Division (Saco) appeals the summary judgment dismissal of its attempt to set aside the award of a contract for 9 mm pistols by defendant-appellee United States Army to intervenor-appellee Beretta U.S.A. Corp. *Saco Defense Systems Division v. Weinberger*, 629 F.Supp. 385 (D.Me.1986). In a prior opinion and order, the district court denied Saco's motion for a preliminary injunction but granted its request for expedited discovery. *Saco Defense System Division, Maremont Corporation v. Weinberger*, 606 F.Supp. 446 (D.Me.1985).

The first hurdle Saco faces is a procedural one. In the district court, it sought injunctive relief, the setting aside of the contract award to Beretta. It now asks that, if it is successful on appeal, the case be remanded for a determination of bid preparation costs. The Army contends that this claim was raised for the first time on appeal and we are precluded from considering it. There is no question that we will not consider a legal issue or theory not presented to the trial court. *Johnson v.*

*Allyn & Bacon, Inc.*, 731 F.2d 64, 73 (1st Cir.1984). Here, however, the issue was raised below to the extent necessary to alert the district court that it was an alternative remedy. Although not raised explicitly in the pleadings, Saco did devote a paragraph to a possible award of bid preparation costs in its Reply to Defendants' Opposition to Plaintiffs' Cross-Motion for Summary Judgment. And the district court in its opinion specifically stated that any harm to plaintiff, "if it had occurred could best be redressed by the award of bid preparation costs." 629 F.Supp. at 394. We, therefore, turn to the substantive issues.

In reviewing an appeal from an entry of summary judgment, the record must be viewed in the light most favorable to the party opposing the motion. *King v. Williams Industries, Inc.*, 724 F.2d 240, 241 (1st Cir.), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Where, as here, both parties have moved for summary judgment, a court separately evaluates the two motions, in each instance drawing factual inferences most favorable to the opposing party. 10A C. Wright, A. Miller & M.K. Kane, *Federal Practice and Procedure* § 2720, at 23–24 (2d ed. 1983).

At the outset of our discussion, we must note that we are not strangers to the award of the 9 mm pistol contract to Beretta. Less than a year ago we considered and rejected the challenge of Smith & Wesson to the Beretta contract. *Smith & Wesson v. United States*, 782 F.2d 1074 (1st Cir.1986). Saco's challenges, however, are different in nature and scope than those raised by *Smith & Wesson.*

After Smith & Wesson was eliminated as a competitor for the 9 mm pistol contract, Saco and Beretta were the only suppliers considered. The decision to award the contract to Beretta was made on January 14, 1985. General Burbules, the Source Selection Authority, summarized the reasons for his choice:

3. Based upon my review of appropriate documentation, I find that award of the multi-year contract should be made to *BERETTA.*

4. The above is based on thorough test and evaluation of eight (8) candidate weapons which eventually qualified the two candidates. The Beretta weapon was one of the two that satisfactorily completed a rigorous test program designed to verify both performance and durability under both normal and adverse environmental conditions. Both weapons met or exceeded all requirements. Selection was made considering all evaluation factors in aggregate, i.e., costs, logistics, technical suitability, production, quality, and management capability. Also, as a result of Best and Final offers, the selected weapon is the low estimated overall evaluated cost offer and provides potential further savings during the life of the weapon due to durability.

Saco was disappointed, and understandably so, because Beretta had won the competition by a score of 857.7 points to 847.36 points for Saco, a difference of 10.34 points out of an optimum of 1,000. The cost figures submitted by Beretta and Saco also reveal the closeness of the competition.

|  | Beretta | Saco Defense |
|---|---|---|
| Unit Cost (Initial Acquisition) | $ 178.50 | $ 176.33 |
| Total Initial Acquisition | $56,393,505.00 | $55,707,937.00 |
| Estimated Spares Cost | 18,368,802.00 | 22,108,465.00 |
| Nonrecurring Costs | 0.00 | 0.00 |
| Total Program | $74,762,307.00 | $77,816,402.00 |

It is evident that the difference in the cost of estimated "spares" tipped the balance in favor of Beretta.

Saco raises two issues on appeal: (1) the Army acted improperly and in violation of the law by failing to conduct any negotiations, or meaningful negotiations, prior to awarding the contract to Beretta; (2) the formula used by the Army to compare the cost of Beretta's and Saco's spare parts was irrational, arbitrary and capricious.

The standard of review for a disappointed bidder on a government contract

is clear. Saco must show that the decision by the Army either had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations. *Smith & Wesson v. United States,* 782 F.2d at 1078–79.

## I. THE NEGOTIATIONS ISSUE

Saco argues that the Army violated the applicable law by failing to conduct meaningful negotiations with Saco and Beretta before making the final contract award, and that Saco was prejudiced by such failure. The law that Saco claims was violated is found in 10 U.S.C. § 2304(g), DAR 3–805 and DARCOM Pamphlet 715–3.

10 U.S.C. § 2304(g) provides:

(g) In all negotiated procurements in excess of $25,000 in which rates or prices are not fixed by law or regulation and in which time of delivery will permit, proposals, including price, shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured, and written or oral discussions shall be conducted with all responsible offerors who submit proposals within a competitive range, price, and other factors considered: *Provided, however,* That the requirements of this subsection with respect to written or oral discussions need not be applied to procurements in implementation of authorized set-aside programs or to procurements where it can be clearly demonstrated from the existence of adequate competition or accurate prior cost experience with the product, that acceptance of an initial proposal without discussion would result in fair and reasonable prices and where the request for proposals notifies all offerors of the possibility that award may be made without discussion.

DAR § 3–805.1 provides in pertinent part:

**3–805.1 General.** Written or oral discussions shall be conducted with all responsible offerors who submit proposals within a competitive range, except that this requirement need not be applied to procurements:

. . . .

(v) in which it can be clearly demonstrated from the existence of adequate competition or accurate prior cost experience with the product or service that acceptance of the most favorable initial proposal without discussion would result in a fair and reasonable price, provided however that the solicitation notified all offerors of the possibility that award might be made without discussion, and provided that such award is in fact made without any written or oral discussion with any offeror.

DARCOM Pamphlet 715–3, which covers the procedure to be followed in procurement proposal evaluation and source selection, refers to "the clarification or negotiation process." DARCOM–P 715–3(3)(d).

We agree with Saco that if negotiations are required, they must be meaningful. The question is whether negotiations were required or whether the exceptions in the statute and the regulation dispensing with the requirement of negotiations applied. The Request for Proposals (RFP) stated:

It is to be specifically understood that:

. . . .

(2) Offerors are advised to submit proposals which are fully and clearly acceptable without additional explanation or information, since the Government may make a final determination as to whether a proposal is acceptable or unacceptable solely on the basis of the proposal as submitted and proceed with the award without requesting further information from any offeror.

RFP lc(2).

Saco argues that negotiations were required because the exception does not apply when best and final offers (BAFO) are requested. Using this argument as a stepping stone, it then contends that meaningful discussions must be held on deficiencies in offerors' proposals and that such discussions cannot be supplanted by requests for best and final offers. The Army's position

is that under the facts of this case the BAFOs were the initial offers and, hence, the exception applies; it also argues that its request for BAFOs satisfied the requirement to conduct meaningful negotiations.

■ Beretta has suggested in its brief that Saco has waived its right to object on the negotiations issue because it submitted its best and final offer without objecting to the lack of negotiations. It does not appear, however, that this argument was raised below; it certainly was not averted to in the district court opinion. We will, therefore, consider Saco's claims on the merits. *Cf. Johnson v. Allyn & Bacon, Inc.*, 731 F.2d at 73.

■ The request for proposals required that technical proposals be submitted by July 20, 1984, and cost proposals by October 9, 1984. Both Saco and Beretta met these deadlines. The RFP was changed on November 20, 1984, when the Army issued amendment 3 to it. The amendment stated on its face: "THE PURPOSE OF THIS AMENDMENT IS TO FORMALLY OPEN NEGOTIATIONS AND INCORPORATE THE FOLLOWING ITEMS FOR YOUR REVIEW PRIOR TO SUBMISSION OF A BEST AND FINAL OFFER." It directed that best and final offers be submitted by December 11, 1984. The parties agree that the significant change made by the amendment to the RFP was in the quantities called for on page 42, Clause E22A.

■ Saco and Beretta received the amendment and submitted their BAFOs on time. Beretta amended its cost proposal in light of the quantity changes made by the amendment. Saco made no changes. Saco did not object to the lack of negotiations when it submitted its BAFO, nor did it request negotiations. We agree with the district court that, under these circumstances, DAR 3–805.1(v) applied to the BAFOs and that the award could be made without negotiations.

Even, however, if we are mistaken as to the applicability of DAR 3–805.1(v), under DAR 3–805.3(a) no discussions with Saco

and Beretta about weaknesses in their proposals were required. DAR 3–805.3(a) provides:

**3–805.3 Discussions With Offerors.**

(a) All offerors selected to participate in discussions shall be advised of *deficiencies* in their proposals and shall be offered a reasonable opportunity to correct or resolve the deficiencies and to submit such price or cost, technical or other revisions to their proposals that may result from the discussions. *A deficiency is defined as that part of an offeror's proposal which would not satisfy the Government's requirements.* [Emphasis added.]

Our examination of the voluminous record reveals no deficiencies by either Saco or Beretta. In making the award, General Burbules stated: "Both weapons met or exceeded all requirements." We do not equate weaknesses with deficiencies. The proposals of both Saco and Beretta satisfied the basic Army requirements. It was not deficiencies in the Saco proposal that resulted in Beretta obtaining the contract. The award went to Beretta because the Army decided, after comparing both proposals, that Beretta would furnish a better pistol for less money than Saco. Under either DAR 3–805.1(v) or DAR 3–805.3(a), no negotiations were required.

It is important to bear in mind that the Army was not procuring a new weapon with complicated design specifications requiring discussions concerning modifications and alterations in design. The 9 mm pistol has been widely used for years. It is difficult to understand what negotiations would have accomplished from the Army's point of view. It had to decide what weapon would perform best under field conditions. Each manufacturer's pistol was subjected to a series of demanding tests. *See Smith & Wesson v. United States* at 1077–80. The weapons of both Saco and Beretta performed well with Beretta having a slight edge. The other consideration was cost, and, here again, Beretta came out ahead. Saco has devoted a great deal of its brief to emphasizing how important a role

negotiations play in procurement contracts. It is true that if the Army had gone over the weaknesses in their proposals with Saco and Beretta, either or both might have improved their scores. We do not think, however, that the Army must negotiate when the facts necessary for its decision are clear and it has notified the competitors that the offers made may be considered without negotiations.

We also find that, under the circumstances, the amendment to the RFP and the request for BAFOs constituted all the negotiations that were required. We must bear in mind that "[c]ourts reviewing government procurement decisions should respect the wide discretion accorded to contracting officers in their evaluation of bids and in their application of procurement regulations." *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1272 (5th Cir.1978). The contracting agencies "have wide discretion in determining the nature and scope of negotiations." *General Electric Company v. Seamans*, 340 F.Supp. 636, 642 (D.D.C.1972). And "that discretion should not be questioned unless it is clearly shown to be without a rational basis." *Drexel Heritage Furnishings v. United States*, 7 Cl.Ct. 134, 153 (1984).

■ The Army determined that Saco's proposal was technically acceptable and there were no deficiencies, "defined as that part of an offeror's proposal which would not satisfy the Government's requirements." DAR 3–805.3(a). The requirement to conduct meaningful negotiations was, therefore, satisfied by a request for best and final offers. *Meridian Junior College*, B–221358, 86–1 CPD ¶ 262 (1986); *Weinschel Engineering Co., Inc.*, B–217202, 85–1 CPD ¶ 574 (1985); *Information Management, Inc.*, B–212358, 84–1 CPD ¶ 76 (1984). As the Comptroller General stated in *Bruno-New York Industries Corporation*, B–184679, 76–1 CPD ¶ 36:

> With regard to Bruno's contention relating to the paucity of negotiations for this contract, our Office has held that the mere request for best and final offers is considered sufficient to meet the require-

ment of the negotiation statute, 10 U.S.C. § 2304(g) (1970). *Dyneteria, Inc.*, B–181707, February 7, 1975, 75–1 CPD 86, and cases cited in text. Since best and final offers were requested from all offerors, we see no basis to question the negotiation process in this regard.

## II. THE TEN PERCENT FACTOR

■ Saco contends strenuously that the ten percent spare parts formula that the Army required bidders to use was irrational, arbitrary and capricious. We find it significant that Saco made no protest about the merits of the spare parts cost formula until after the Army announced that the contract would be awarded to Beretta. 4 C.F.R. § 21.21(2)(1) (1984) provides in pertinent part:

> (a)(1) Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the closing date for receipt of initial proposals *shall be filed prior to bid opening or the closing date for receipt of initial proposals.* [Emphasis added.]

Saco attempts to circumvent this deadline by asserting that the formula's irrationality "could not have been known to it until after the competition was over and the contract awarded." Appellant's Reply Brief at 11. This, Saco argues, is because it did not believe that the ten percent factor would be used as it was. Saco further claims that it relied on information in the RFP that the ten percent factor was merely a method to facilitate submission of the spare parts list. This argument does not withstand scrutiny. The solicitation was explicit as to the spare parts pricing information that each bidder was required to submit:

> (1) Offeror shall list and price *each and every* weapon piece part (including receiver) on a catalog fixed price basis including packaging to Government standards.
>
> (2) Component part quantities for pricing purposes shall be based upon *10 percent* of the annual major item quantities. Exceptions to the 10 percent quantity

factor are the magazine components wherein the pricing quantity shall be *400 percent* of the annual major item quantity and those items wherein more than one component is required per weapon.

(3) [O]fferors shall make appropriate quantity factor adjustments where more than one component is required per weapon.

The solicitation went out to Saco and the other bidders on March 4, 1984. The Army held a conference in April, 1984, to discuss the solicitation. After the conference, a summary of the points discussed was distributed to those who attended, which included Saco. The summary contained the following:

### 9MM REPAIR PARTS

Basis for Contractor Catalog Pricing

*Piece-Part Pricing*

100 Percent of Piece-Parts Are Included

Pricing Quantity Is 10 Percent of Annual MYP Quantities

Magazine Piece-Parts to Be 400 Percent

Multiple Use Piece-Parts to Be Adjusted by Multiples of 10 Percent

Basis for Packaging and Packing Is Preestablished with FOB At Origin

*Subassembly Pricing*

Contractor Will Price the Magazine Assembly and Other Recommended Subassemblies. Magazine Assembly Pricing Is to Be Based Upon a Quantity of 400 Percent of the Annual MY Quantities.

### SECTION L

*Question:* Catalog Pricing (Page 116/117) Is to Be Based Upon Quantities of 10 Percent of the Contract Quantity (400 Percent for Magazines). Should Para C(4) Page 117 read 10 Percent and 400 Percent or 20 Percent and 500 Percent?

*Answer:* 10 Percent and 400 Percent Are Being Used for Pricing Purposes As Being "Representative" of Actual Government Requirements Over the 311,000 Multi-Year Quantity. Twenty Percent and 500 Percent Are Being Used As an Upper Limit for Potential Government Ordering Purposes. It Is Quite Conceivable That Government Requirements May Exceed 10 Percent for Individual Repair Parts Especially During the Early Phases of Fielding.

At no time prior to the announced decision to award the contract to Beretta did Saco question or complain about the ten percent spare parts formula. In the face of the language used by the Army and the procedure it followed to make the application of the formula clear, Saco's contention that it did not understand that the ten percent factor would apply to each and every part on the pistol does not wash. This is tantamount to saying that we know what you said, but we did not believe you meant it. We agree with the district court that Saco's protest to the spare parts formula was too late.

■ We are constrained to add that, based on our review of the record and particularly the affidavits and deposition of Lieutenant Colonel Roddy, who was responsible for the ten percent formula, we cannot find that the spare parts formula was irrational, arbitrary or capricious. The fact that it was a new approach and had not been used before does not make it irrational. Indeed, it is now used "routinely" in Army procurements. Dep. of George E. Dousman, App. Vol XI at 3866. The formula was based on Colonel Roddy's experience, skill and expertise in the procurement field and the advice he sought and obtained from others familiar with procurement problems. The role of a reviewing court in procurement cases is a limited one. A procurement decision should not be overturned unless there was no rational basis for the agency decision or a showing of clear illegality has been made. *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 434 (3d Cir.1979). Neither of these factors is present here.

There is one final observation to be made. We have reviewed the entire record and have found no evidence that would suggest that the Army favored Beretta in any way during the procurement process. Beretta and Saco were both subject to the same procedures and requirements. It was a close competition. Beretta won, and there is no basis for Saco crying foul.

*Affirmed.*