782 F.2d 1074
 33 Cont.Cas.Fed. (CCH) 74,233, 19 Fed. R.
Evid. Serv. 1500
SMITH & WESSON, DIVISION OF BANGOR PUNTA CORPORATION, Appellant,
v.
UNITED STATES of America, and John O. Marsh, Jr., Secretary
of the Army, Appellees.
 No. 85-1697.
 United States Court of Appeals,
First Circuit.
 Argued Dec. 5, 1985.
Decided Feb. 4, 1986.
Rehearing and Rehearing En Banc Denied March 4, 1986.
 
 Charles E. Raley, Washington, D.C., with whom James S. Phillips and Israel and Raley, Chartered, Washington, D.C., were on brief for appellant.
 C. Brian McDonald, Asst. U.S. Atty., Springfield, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., were on brief, Richard W. Oehler, Dept. of Justice, Civil Div., Commercial Litigation Branch, Washington, D.C., for appellees.
 Before CAMPBELL, Chief Judge, and BOWNES and BREYER, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 After being eliminated as a candidate for a contract to supply the military with .9mm pistols, Smith & Wesson (S & W) brought an action in the district court seeking to reverse the Army's decision that the pistols manufactured by it failed two of the Army's test requirements. The district court found against S & W and refused to enjoin the Army from further proceeding with its pistol procurement program until S & W was reinstated as a contract candidate. S & W appeals that decision.[1]
 
 
 2
 Appellant mounts two lines of attack on the decision below: that the district court erred legally and factually in upholding the Army's decision; and that the district court denied S & W a fair trial.
 
 
 3
 At the outset, we note that both parties seem to assume that this is an appeal from the denial of a preliminary injunction. At least the cases they cite for the relevant standard of review are cases involving appeals from the grant or denial of preliminary injunctions. The record shows that at the start of trial the court stated: "This is a request for injunction consolidated with the trial on the merits, 65(a)(2) of the Federal Rules of Criminal [Civil] Procedure." No objection was taken to this ruling. We, therefore, treat this as an appeal from a full-fledged trial on the merits.
 
 I. THE ARMY TEST PROCEDURE
 A. Background
 
 4
 Several years ago the military decided to replace its .38 and .45 caliber handguns with a .9mm automatic pistol. There were two reasons for the changeover, better effectiveness and reliability and because such a weapon would use ammunition compatible with that used by NATO. The Army was given the responsibility for selecting a suitable .9mm weapon for all branches of the military. It decided that, instead of following its usual weapon procurement practice of developing its own design and putting out bid specifications, it would buy a commercially available .9mm pistol and adapt it for military use. The Congress allocated $1.9 million to fund the Army's selection process.
 
 
 5
 In November 1983, the Army issued a Request For Test Samples (RFTS) to various manufacturers of handguns, including Beretta, who was ultimately awarded the contract, and S & W. The RFTS included a cover letter, a description of the weapon characteristics required, test package requirements and a brief test summary. The RFTS cover letter made it clear that, although the Army did not then have the funds for actual weapon procurement, failure of a company's weapon to pass the testing program would eliminate that company from contract solicitation when procurement funds became available:
 
 
 6
 Manufacturers whose test samples meet or exceed the PDW characteristics described in enclosure 1 will be afforded an opportunity to compete for any future production contract, when, and if, such procurement is authorized and funded by Congress. Results from RFTS testing will be the most important of all evaluation factors under any subsequent procurement action source selection process. It is possible that the procurement action will be issued prior to completion of testing. In that event, the solicitation will be limited to those offerors whose weapons have not been eliminated from testing. If an offerors' [sic] weapon is subsequently eliminated from consideration, the offeror will be informed as soon as possible and no proposal from the offeror in response to the competitive solicitation will be considered.
 
 
 7
 In September of 1983, the Army had circulated a draft of the proposed RFTS within the industry for comment. A technical conference was held with those interested in October 1983, at which S & W was present. No one at the conference objected to the RFTS procedure or the weapon characteristics to be tested. Some questions were asked about particular test methods and evaluations. The attendees were informed that they would not be allowed to observe the testing program. S & W did not object to any of the proposed RFTS procedures or requirements.
 
 
 8
 Because S & W's brief is laced with allegations that the Army used "covert" test procedures and altered the test results from "pass to fail," it is necessary to explain the Army's test evaluation process. The tests were performed at three sites: Fort Benning, Georgia; Fort Dix, New Jersey; and Aberdeen Proving Ground, Maryland. The raw test data was given to the test coordinator who compiled it and turned it over to the Test Evaluation Board. The Evaluation Board was composed of civilians and representatives from each branch of the armed services, all of whom were technical experts on small arms. It reviewed the data supplied, evaluated it, and reported its results to the Test Advisory Board. The Advisory Board consisted of senior officers representing all branches of the services. The function of the Test Advisory Board was to review the report of the Test Evaluation Board to ensure that its evaluation comported with the procedures outlined in the RFTS. If the Advisory Board felt that a candidate should be terminated because of a failure to meet the test requirements, it so recommended to the Source Selection Authority, a single individual who alone had the authority to terminate a candidate, and furnished him with the pertinent test data.[2]
 
 
 9
 In May of 1984, procurement funds were authorized and a Request for Proposals (RFP) was issued to all RFTS candidates who, at that time, had not been eliminated. S & W was still a candidate when the RFP was issued. It was eliminated as a candidate on September 18, 1984, before it submitted its proposal in response to the RFP. Its proposal, which was subsequently submitted, was not considered.
 
 B. Testing and Evaluation
 
 10
 The RFTS described three categories of characteristics that a candidate's weapon would be required to meet in order for the candidate to be eligible for a procurement contract.[3] Categories one and two were absolutely mandatory; failure to meet them would result in elimination from the procurement process. The Army might allow a manufacturer to correct a category three deficiency. We are concerned here with two characteristics, both within mandatory category two, and the tests used to determine them: firing pin energy, which required that a minimum of twenty-four-inch ounces of energy be delivered to the cartridge primer; and a service-life requirement of at least 5,000 rounds. The Army determined that S & W's weapons failed the firing-pin-energy test and the service-life test and eliminated S & W as a candidate for the .9mm pistol contract.
 
 
 11
 Before considering S & W's objections to the testing program, we set out the standard of review that controls. A disappointed bidder on a government contract must show that the decision by the government agency either had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations. Choctaw Manufacturing Co., Inc. v. United States, 761 F.2d 609, 616 (11th Cir.1985); Delta Data Systems Corp. v. Webster, 744 F.2d 197, 204 (D.C.Cir.1984); Princeton Combustion Research Laboratories, Inc. v. McCarthy, 674 F.2d 1016, 1021-22 (3d Cir.1982); Kinnett Dairies, Inc. v. J.C. Farrow, 580 F.2d 1260, 1271 (5th Cir.1978); Kentron Hawaii, Limited v. Warner, 480 F.2d 1166, 1169 (D.C.Cir.1973).
 
 
 12
 S & W attacks the firing-pin-energy test on the grounds that it was performed in a sequence contrary to the test summary sequence outlined in the RFTS and that the test itself was inaccurate. We think S & W misinterprets the scope of the RFTS. The RFTS was not intended to limit or restrict the Army's testing program. It stated what weapon characteristics would be required. The RFTS test summary outlined the test program generally. The Army deliberately did not detail the procedures or methods that would be used. Its RFTS cover letter stated, inter alia: "Weapons will be tested and evaluated to determine their conformance to these characteristics." Nothing in the RFTS suggests that the Army agreed to use certain tests or follow a prescribed sequence in performing them. If the Army had changed its RFTS announced pistol characteristics, a disqualified candidate might cry "foul," but this was not done. The RFTS was advisory only. S & W's attempt to transform it into a regulation binding the Army to follow it in lockstep distorts its purpose, negates its meaning, and ignores its language.
 
 
 13
 We now turn to the test used to determine firing pin energy which S & W attacks as inaccurrate and fallacious. The district court has explained at length the details of this test so we only outline the procedures followed. There were two procedures used; both involved measuring the indentation (indent) the firing pin made when it struck a copper cylinder fixed in a holder so as to simulate a cartridge ready for firing. In the first procedure a series of indents were made in the copper cylinders by pulling the trigger of the pistol. Five indents were made in the single action mode and five by double action firing. Both sets of indents were measured and recorded. In the second procedure, the indents were made by dropping a set weight a predetermined distance on a firing pin provided by each manufacturer candidate. Three indents were made by each candidate's firing pin. The indents made in both procedures were measured by the same method. The measuring device was a special supermicrometer that measured out to ten-thousandths of an inch. After the indents were made, the outside of each copper cylinder was checked to see that it met the specifications of four-tenths of an inch. This was done by turning the outside of the copper cylinder against the dial indicator of the measuring device which had been "zeroed" to .4000 of an inch. This meant that if the outside edge of the copper cylinder measured four-tenths of an inch, the dial registered zero. The tip of the measuring device was then inserted into the indent as far as it could go and the measurement reading, which was to the nearest five ten-thousandths, was taken. The results of the indent test were reported to the test coordinator and then to the Evaluation Board.
 
 
 14
 S & W makes so many blunderbuss charges against the accuracy and validity of the firing-pin-energy tests that it is difficult to sort out the duds from the live charges. Its main complaint seems to be that the measurements were inaccurate because the measuring device was not zeroed to .4000 inches each time a copper cylinder was measured. What difference this would have made in the test results is a judgment we are not equipped to make. The record shows that this method of indent measurement was a standard procedure used in thousands of tests for at least twelve years. All of the weapons submitted were subjected to the same tests. It is possible that more accurate test methods could have been used, but we are convinced that there was nothing unfair, invalid or basically inaccurate in the indent testing. It follows, therefore, that the Army's determination that S & W's weapons did not meet the firing pin energy test must stand.
 
 
 15
 The other test that S & W pistols failed was the service-life test. The Army determined that the service life of a pistol ended when a crack visible to the naked eye was detected in the pistol frame or when the pistol otherwise showed signs of imminent failure, excessive wear or safety hazards. The test called for seven pistols from each manufacturer. All would be fired to 3,500 rounds and three would continue to be fired to 5,000 rounds and then to 7,000 rounds. The weapons were inspected, cleaned and lubricated every 500 rounds. When the 5,000-round point was reached, a crack visible to the naked eye was found in one of the S & W weapons. The 7,000-round inspection disclosed that a piece had broken from the frame in another of the S & W weapons. The third S & W pistol was fired to 7,000 rounds without any defects developing.
 
 
 16
 S & W's attack on the service-life test is simple and direct; it asserts that its pistols passed the test as set forth in the RFTS. The Army determined that, although the crack in the frame was not discovered until 5,000 rounds had been fired, the crack must have started prior to that point. Since every weapon was examined after every 500 rounds of firing, the Army reasoned that the crack started to develop between 4,500 and 5,000 rounds of firing. The validity of this determination was testified to by test director Richard Audette, George B. Niewenhous, principal tester at Aberdeen Proving Ground, and Louis Delattre, who made an independent evaluation of the Army's .9mm pistol procurement program. Delattre gave a detailed explanation of the validity of the service-life test. He explained that a crack in the frame could not have been caused by firing a single round and that a crack caused by firing enlarges as the firing continues. S & W's insistence that it passed the service-life test because the crack was not detected until after 5,000 rounds were fired is based on its interpretation of the RFTS test summary, not on what actually happened on the firing line. There was nothing irrational, unfair or inaccurate about the service-life test.
 
 
 17
 We find and rule that the decision of the Army that S & W's weapons failed to meet the firing-pin-energy requirement and the service-life requirement was neither irrational nor a violation of applicable statutes and regulations. It must also be noted that the weapons of Beretta, the company awarded the contract, passed all of the tests in categories one, two and three.
 
 
 18
 S & W also claims that it was treated unfairly because Saco, one of the three candidate manufacturers, was allowed to continue in the competition, although two of its weapons failed the dry mud part of the Adverse Conditions Test. This test was part of the category two mandatory requirements. The treatment of Saco, however, has no bearing on the performance of S & W weapons in the other mandatory tests. Saco was not awarded the contract, so its preferential treatment on this test, if there was any, had no adverse impact on S & W. We note also that the Army had a rational and reasonable explanation for allowing Saco to continue in the competition: that the Saco weapons performed better or comparable to the standard in the sand, dust, water spray, and wet mud tests, but that the weapon experienced stoppages only when the magazine was covered with caked-on mud. The Army felt that this would not be a likely field condition.
 
 C. The Due Process Violation Claims
 
 19
 S & W attempts to raise a due process claim against the Army. On appeal, it has alleged that the Army's elimination of S & W by letter without a hearing deprived it of a constitutionally protected property and liberty interest without due process of law. This issue, however, was not raised below, either in the pleadings or at the trial. It, therefore, cannot be raised for the first time on appeal. Wallace Motor Sales, Inc. v. American Motors Sales Corporation, 780 F.2d 1049, 1067 (1st Cir.1985); Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir.1979).
 
 
 20
 There are some observations, however, that must be made. First, there is nothing in the record to support S & W's contention that the Army's action permanently disbars it from bidding on or seeking government contracts in the future. S & W was eliminated from competing for a single contract; that is all. See Myers & Myers, Inc. v. United States Postal Service, 527 F.2d 1252, 1258 (2d Cir.1975). Second, there is no basis at all for finding that S & W had a property interest. The RFTS was simply an invitation by the Army to weapon manufacturers to submit .9mm pistols for tests to determine whether a manufacturer would be considered as a contract candidate. It did not, as S & W asserts, give it "a legitimate claim of entitlement" to the pistol contract. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Award procedures are not designed to establish private entitlements to public contracts but to produce the best possible contracts for the government. Delta Data Systems Corp. v. Webster, 744 F.2d at 206.
 
 
 21
 Nor has the plaintiff shown that there is any basis for his claim of a liberty interest. In the context of government procurement contracts, a liberty interest requiring due process protection arises only when a company is barred from the procurement process, or eliminated from it, because of charges of fraud or dishonesty made without an opportunity for a hearing on those charges.
 
 
 22
 While the deprivation of the right to bid on government contracts is not a property interest (procurement statutes are for the benefit of the government, not bidders, Keco Industries v. U.S., 428 F.2d 1233 (Ct.Cl.1970)), the bidder's liberty interest is affected when that denial is based on charges of fraud and dishonesty. Old Dominion Dairy Products, Inc. supra. The minimum requirements of due process are notice and an opportunity for hearing appropriate to the nature of the case. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed. 113 (1971).
 
 
 23
 Transco Security, Inc. of Ohio v. Freeman, 639 F.2d 318, 321 (6th Cir.), cert. denied, 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981). See also ATL, Inc. v. United States, 736 F.2d 677, 683 (Fed.Cir.1984). The failure of its weapons to pass the Army tests did not impugn the honesty or integrity of S & W.
 
 II. THE TRIAL
 A. Irreparable Harm
 
 24
 We begin our review of the trial by noting that there is no evidence in the record of any irreparable harm to the plaintiff. This was an action seeking injunctive relief only: that the Army be enjoined from proceeding further on its .9mm automatic pistol procurement program unless and until S & W was reinstated as a contract candidate. No relief in the form of damages was sought. It is elementary that when injunctive relief is sought the party seeking it must prove, inter alia, that it will be irreparably harmed unless such relief is ordered. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07, 79 S.Ct. 948, 954-55, 3 L.Ed.2d 988 (1959). Sampson, Administrator v. Murray, 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974), speaks to the absence of such proof. After citing to Beacon Theatres, the Court said "Yet the record before us indicates that no witnesses were heard on the issue of irreparable injury...." There was no testimony here that S & H would suffer irreparable harm by its failure to be considered for the contract and that if it had been wrongfully eliminated from consideration, damages would not be an adequate remedy.
 
 
 25
 The necessity for proving irreparable injury is particularly compelling in government procurement cases because of the "strong public interest in an orderly efficient, expeditious government procurement process." United States v. John C. Grimberg Co., Inc., 702 F.2d 1362, 1371 (Fed.Cir.1983). See also Cincinnati Electronics Corporation v. Kleppe, 509 F.2d 1080, 1089 (6th Cir.1975). We agree with the court in M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1303 (D.C.Cir.1971):It would be intolerable for any frustrated bidder "to render uncertain for a prolonged period of time government contracts which are vital to the functions performed by the sovereign." [Citation omitted.]
 
 
 26
 ....
 
 
 27
 In the more relaxed context of an action for damages, the court has an effective opportunity to give careful consideration to the controversy at hand, to probe the various and interrelated provisions of regulations, contract terms and specifications, questioning technical witnesses if necessary, reviewing pertinent administrative procedures and practices that give content as well as background to generalized regulations.
 
 
 28
 S & W's complaint contains only the broad allegation that it would suffer "substantial and irreparable harm and injury." No specifics as to how and why such injury would occur were stated. In both its prehearing and pretrial statements, S & W claimed that it would incur irreparable injury because, under the applicable law, it could recover only test preparation expenses and could not recover loss of future profits. Passing the correctness of that statement, there is nothing in any of the numerous motions and memoranda filed in the district court stating or even suggesting the amount of loss of profits anticipated. And of even more significance is the complete lack of any evidence, loss of profits or otherwise, on irreparable injury introduced by S & W at trial. Although S & W's failure of proof on this issue is fatal, we go on to review its claim of deprivation of a fair trial.
 
 B. The Conduct of the Trial
 
 29
 S & W alleges that it was denied a fair trial because the district court "frustrated" proper discovery, excluded relevant evidence and "foreclosed" cross-examination. We start with discovery. Our standard of review is well established. The control of discovery and the admission of evidence is within the discretion of the trial court and, absent an error of law, the abuse of discretion standard applies. Johnson v. H.K. Webster, Inc., 775 F.2d 1, 8 (1st Cir.1985); Otis Clapp & Son, Inc. v. Filmore Vitamin Co., 754 F.2d 738, 744 (7th Cir.1985); Hayden v. Bracy, 744 F.2d 1338, 1342 (8th Cir.1984). After reviewing the hundreds of pages of documents produced by the Army, it is difficult to understand how discovery was frustrated, although we acknowledge that examination of the mass of documents could well be frustrating.
 
 
 30
 S & W's specific discovery complaints are: that it was barred from examining the pistols of the other candidate manufacturers exhibiting receiver failurers; that it was not allowed to examine all the material and comments relative to the second set of indent measurements for all candidates; and that it was foreclosed from examining by deposition or at trial the person who made the final decision that S & W's weapons failed the firing-pin-energy and service-life tests. We think the district court acted within its discretion in not allowing S & W access to the test results and evaluation comments concerning the weapons of the other candidates. Such information would give S & W a decided advantage over its principal competitors. The protection of confidential commercial information from discovery is specifically provided for in Federal Rule of Civil Procedure 26(c)(7), which is "fully applicable to the United States as a party." Federal Open Market Committee v. Merrill, 443 U.S. 340, 356, 99 S.Ct. 2800, 2810, 61 L.Ed.2d 587 (1979).
 
 
 31
 As for the Army's refusal to produce its decision maker for deposition or trial, we note that the following witnesses were produced and examined assiduously and at length: George B. Niewenhous, the principal tester on the .9mm pistol program at the Aberdeen Proving Ground; Richard Audette, a physicist acting as test director for the firing-pin-energy and service-life tests; Michael Abel Roody, III, Lieutenant Colonel, United States Army Ordinance Corps, product manager for the .9mm pistol program; Louis F. Delattre, an independent evaluator of the .9mm pistol procurement program; and Edward M. Beckman, chairman of the Source Selection Evaluation Board (formerly the Technical Evaluation Board) which made the recommendation that S & W be terminated from the program. S & W had an opportunity to examine at trial those who conducted the tests, the person in charge of the program, the person who made an independent evaluation of the program and the chairman of the Board who made the final recommendation. Since the termination recommendation was obviously followed by the decision maker, we do not think that the district court abused its discretion in not ordering that person to testify. If his decision had been contrary to the recommendation and the test results, there might be cause to determine the reasons for it but, under the circumstances, his testimony was not necessary.
 
 
 32
 The relevant evidence that S & W claims the district court excluded was a physical demonstration test to be performed by S & W's experts to show that the indent measurement procedure used by the Army was inaccurate. The court excluded the demonstration test because the equipment to be used did not meet the same standards as the equipment used by the Army in its test. This was a judgment call and we find no abuse of discretion.
 
 
 33
 S & W claims that the refusal of the court to allow its demonstration test circumscribed its cross-examination of Audette, the director of the firing-pin-energy test, and prevented it from impeaching him. Our reading of the record shows that the intensive examination of Audette by counsel for S & W both before and after the ruling excluding the demonstration test subsumed what it would have demonstrated. We find no improper restriction of cross-examination on this score. Nor do we find that the district court's discovery orders and ruling violated S & W's right to effective cross-examination.
 
 
 34
 The next issue relative to the conduct of the trial was the court's refusal to turn over to S & W the complete report which Niewenhous had reviewed prior to testifying.[4] Federal Rule of Evidence 612 provides in pertinent part:
 
 Rule 612. Writing Used to Refresh Memory
 
 35
 Except as otherwise provided in criminal proceedings by section 3500 of title 18, United States Code, if a witness uses a writing to refresh his memory for the purpose of testifying, either--
 
 
 36
 (1) while testifying, or
 
 
 37
 (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,
 
 
 38
 an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.
 
 
 39
 The court examined the unredacted report in camera and refused to disclose it to S & W's counsel. Here again, the test is whether the district court abused its discretion in determining that such disclosure was not necessary "in the interest of justice." United States v. Massachusetts Maritime Academy, 762 F.2d 142, 157 (1st Cir.1985); Cosden Oil & Chemical Company v. Karl O. Helm Aktiengesellschaft, 736 F.2d 1064, 1077 (5th Cir.1984); United States v. Howton, 688 F.2d 272, 277 (5th Cir.1982). We find no abuse of discretion in the district court's rule.
 
 
 40
 Two other trial issues need only brief treatment. The district court did not abuse its discretion in setting aside the default judgment it had issued against the Army on April 5, 1984, for failure to plead or otherwise defend. The court found that because the case had been juggled among three federal courts and the defendants had shown the existence of a meritorious defense, the good cause requirement of Federal Rule of Civil Procedure 55(c) for setting aside a default had been met. We agree.
 
 
 41
 Nor did the district court abuse its discretion or act unfairly in scheduling the case for trial when it did. S & W complains that it did not have sufficient time to prepare, but it sought injunctive relief as soon as possible. It agreed to the trial date. Although in doing so, it may have succumbed to pressure from the district court, a reading of the trial transcript convinces us that it was not time for preparation that was fatal to S & W's case. Additional preparation time would not have changed the test results or the discovery and trial rulings. The case was well tried by S & W's counsel, but the ammunition available was not sufficient to pierce the Army's impregnable shield of rationality and legality.
 
 
 42
 We have considered all the other issues raised by S & W and find that they do not merit discussion.
 
 
 43
 There are two post-trial motions that require rulings. Since we have reviewed all of the materials in the appendix, the Army's motion to strike material from it, although legally sound, is moot. In its reply brief, S & W, under the heading of "Recently Discovered Information," asserts that "Beretta has failed the firing pin indent and other tests and requirements" and that the Army now admits "that Smith & Wesson, among other candidates, had a service life of 5,000 rounds and met the JSOR criteria." It is clear that S & W's reply brief on pages 1-30 states and argues facts that were not part of the record and pages 35-42 of the addendum to the brief contain materials not included in the record.
 
 
 44
 We are an appellate tribunal, not a nisi prilus court; evidentiary matters not first presented to the district court are, as the greenest of counsel should know, not properly before us. Nogueira v. United States, 683 F.2d 576, 578 (1st Cir.1982); United States v. Sachs, 679 F.2d 1015, 1019 (1st Cir.1982); United States v. Payton, 615 F.2d 922, 925 (1st Cir.), cert. denied, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980).
 
 
 45
 United States v. Kobrosky, 711 F.2d 449, 457 (1st Cir.1983). The Army's motion to strike pages 1-30 of the reply brief and pages 35-42 of its addendum is granted.
 
 
 46
 In closing, we note that this case was concerned with the Army's second attempt to obtain a procurement contract for .9mm pistols. We do not know whether another procurement program is in the offing; we do know, however, that as far as this court is concerned this case is concluded.
 
 
 47
 Affirmed.
 
 
 
 [1]
 The district court had originally transferred the case to the Court of Claims. We reversed, holding that the Federal Courts Improvement Act of 1982, 28 U.S.C. Sec. 1491(a)(3), did not divest the district courts of jurisdiction over pre-award contract claims against an agency of the United States. In re Smith & Wesson, 757 F.2d 431 (1st Cir.1985)
 
 
 [2]
 After procurement funds were voted by the Congress, the Test Advisory Board was renamed the Source Selection Advisory Council and the Test Evaluation Board became the Technical Evaluators for the Source Selection Advisory Council
 
 
 [3]
 There was a fourth category which included desirable as distinguished from mandatory characteristics
 
 
 [4]
 S & W had been furnished a redacted copy of the report