AMERICAN SCIENCE AND ENGINEERING, INCORPORATED, Plaintiff,

v.

The Honorable Raymond H. KELLY, Commissioner, United States Customs Service Defendant,

and

EG & G Astrophysics Research Corporation, Intervenor.

American Science and Engineering, Incorporated, Plaintiff,

v.

EG & G Astrophysics Research Corporation, Defendant.

Civil Action Nos. 99–10365–GAO, 98–11939–GAO.

United States District Court, D. Massachusetts.

Aug. 24, 1999.

228

Thomas M. Sobol, Robert F. Daut, Brown, Rudnick, Freed & Gesmer, Boston, MA, W. Bruce Shirk, Powell, Goldstein, Frazer & Murphy, LLP, Washington, DC, for Plaintiff.

Lee J. Freedman, Dept. of Justice, Civil Div., Washington, DC, Kirk C. Teska, Iandiorio & Dingman, Waltham, MA, for Defendants.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

Plaintiff American Science and Engineering, Inc. ("AS & E") challenges the legality of a government contract entered into by the United States Customs Service ("Customs") and EG & G Astrophysics Research Corp. ("EG & G"). AS & E claims that Customs, in entering into the contract, violated the Competition in Contracting Act ("CICA"), Pub.L. No. 98–369, 98 Stat. 1175 (codified as amended in various sections of Titles 10, 31, 40 and 41 U.S.C.) and the Trade Secrets Act, 18 U.S.C. § 1905. AS & E also asserts that EG & G misappropriated its trade secrets. AS & E moved for a preliminary injunction enjoining both parties from continuing performance under the contract. After an evidentiary hearing and extensive briefing by all parties, the Court determines that the motion for a preliminary injunction ought to be DENIED.

## I. *Findings of Fact*

### A. *AS & E Generally*

AS & E develops and manufactures x-ray equipment systems designed to detect contraband that may be smuggled in luggage, trucks or other large storage containers. As a general matter, x-ray systems, including those manufactured by AS & E, may employ one or both of two different kinds of images of an object being scanned: a "transmission" image produced from x-rays that pass through the object, and a "backscatter" image created from the x-ray photons that are reflected off the scanned object back toward or to the side of the x-ray source. Transmission imaging is most useful in detecting materials with high atomic numbers, such as metals, while backscatter imaging is better at generating images of materials with low atomic numbers, such as narcotics, plastic explosives and other organic contraband.

A beam emitted from an x-ray source is typically cone-shaped. X-ray inspection systems often require that cone-shaped beams be adjusted or altered into different shapes. The realignment of the beam may be accomplished by means of a "collimator," a device or series of devices placed between the x-ray source and the object being scanned. The collimator absorbs excess, undesired x-rays as it allows a beam in the desired shape to reach the scanned object. The same effect would be achieved if one were to hold a piece of cardboard with a hole in it in front of a flashlight beam. Most of the light would be intercepted by the cardboard screen, but a circle or line of light would pass through the hole.

For transmission imaging, usually a two dimensional fan-shaped beam is created, like the beam that would result if the cardboard in front of the flashlight had a long, narrow slit in it. The beam passes through the scanned object and is received on the other side by an x-ray detector. Since the detector measures only those

beams that pass through the object, the image produced is a "shadow" of what was scanned.

For backscatter imaging, since the detector is measuring scattered x-rays, it is necessary to measure nearly simultaneously both the precise point at which the x-ray contacts the object *and* the location at which the scattered x-ray is detected. To effect this, AS & E has developed collimators that create a continuous "pencil beam" or "flying spot" that "scans across the inspected object and along the length of an elongated detector positioned so that the beam impinges on it." Callerame Aff. (Dkt.# 4), Ex. 2 at ¶ 10. One way to create a "flying spot" is to use a collimator that is a rotating cylinder such that the dot-like beam that is permitted to pass through will travel parallel to the long axis of the cylinder as it rotates. The beam will seem to "fly" or move across the object being scanned.

B. *Procurements Under the Competition in Contracting Act*

Congress enacted CICA in 1984, in response to what it considered inefficiency and wasteful spending in the Federal Government's procurement process. According to its drafters, CICA's goals were "to establish a statutory preference for the use of competitive procedures in awarding federal contracts for property or services, to impose restrictions on the awarding of noncompetitive contracts, and to permit federal agencies to use the competitive method most conducive to the conditions of the contract." S.Rep. No. 98–50, 98th Cong., 1st Sess., at 1 (1983), *reprinted in* 1984 U.S.C.C.A.N. 697, 2174 (1984). The purpose to promote competition permeates both CICA and the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 1.000 *et seq.* Thus, for property or services procurements, executive agencies, except in rare circumstances, are required to "obtain full and open competition through the use of competitive procedures" and "use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement." 41 U.S.C. § 253(a)(1); *see also* 48 C.F.R. § 6.101.[1]

A Broad Agency Announcement ("BAA") may be a competitive procedure satisfying the requirements of CICA in limited circumstances. A BAA is a general notice published in the Commerce Business Daily that is used to solicit innovative proposals in various research fields. Only if it is used for the "selection of basic and applied research and that part of development not related to the development of a specific system or hardware procurement" can a BAA be considered to be a "competitive" procedure consistent with CICA. *See* 48 C.F.R. § 6.102(d)(2).

In addition, CICA at times allows executive agencies to exclude a particular source (or sources) from participation in a procurement if doing so would "establish or maintain any alternative source or sources of supply" for the desired property or services.[2] 41 U.S.C. § 253(b)(1); 48 C.F.R. §§ 6.200, 6.201, 6.202. To exclude

---

1. Section 253(c) of Title 41 lists when executive agencies may employ non-competitive procurement procedures. Prior to doing so, contracting officers for the relevant agency must satisfy a series of requirements to justify the absence of competition. *See* 41 U.S.C. § 253(f); 48 C.F.R. §§ 6.303–1, 6.303–2, 6.304, 6.305. The process is referred to as a "JOFOC" (Justification for Other than Full and Open Competition). Full and open competition "means that all responsible sources are permitted to compete" for a procurement. 48 C.F.R. § 6.003. One circumstance in which a contract may be awarded without actual competition, called a sole source justification, is when "the property or services needed by the executive agency are available from only one responsible source and no type of property or services will satisfy the needs of the executive agency." 41 U.S.C. § 253(c)(1); *see also* 48 C.F.R. § 6.302–1.

2. For example, exclusion of a source may be proper if it "would increase or maintain competition and would likely result in reduced overall costs for such procurement, or for any anticipated procurement, of such property or services." 41 U.S.C. § 253(b)(1)(A); 48 C.F.R. § 6.202(a)(1). In effect, then, in some circumstances CICA allows non-competitive procedures to be used to increase competition.

a source, however, certain prerequisites must be satisfied. The agency head initially must determine that at least one of the justifications specified in 41 U.S.C. § 253(b)(1) has been met and must support that decision by a written "determination and findings," *see* 48 C.F.R. § 6.202(b)(1), containing the administrator's "statements of fact or rationale." 48 C.F.R. § 1.701. Once a source or sources has been excluded from participation, as to all other potential sources the procurement must adhere to the normal competitive procedures required elsewhere in CICA and the FAR. 48 C.F.R. § 6.201.

### C. *Relationship Between AS & E and Customs*

AS & E has contracted with Customs in the past to furnish various types of non-intrusive x-ray systems. In 1986 and again in 1990, Customs purchased from AS & E mobile van x-ray inspection systems equipped with backscatter technology. *See In re EG & G Astrophysics Research Corp.*, 90–2 CPD ¶525, at 1 (Dec. 28, 1990). Customs awarded the 1990 contract to AS & E on a sole source basis because at the time only AS & E could provide a system with backscatter technology. *See id.* at 2. The Comptroller General approved this determination. *See id.* at 5.

In response to a BAA issued in late 1993 or 1994, AS & E submitted a white paper[3] proposing the manufacture of a fixed truck x-ray system. Thereafter, Customs awarded AS & E a contract for such a system, again on a sole source basis, *see* AS & E Ex. 108 at 1, that ultimately resulted in AS & E's furnishing four fixed x-ray systems. *See* May, 18, 1999 Tr. at 72; AS & E Ex. 185 at 1.

### 1. *Mobilesearch 1 and 2*

Prior to January, 1994, Customs had "suggested" to AS & E that it propose a

mobile truck x-ray system ("MTXR")[4] to examine cars and trucks for contraband at points of entry, *see* May 20, 1999 Tr. at 20, and AS & E submitted a white paper that responded to that suggestion. A contract resulted in late 1994, and AS & E produced its first MTXR, which it called "Mobilesearch 1." Customs later amended the 1994 contract to require AS & E to deliver to it a second MTXR, "Mobilesearch 2."

A March, 1996 review of Mobilesearch 1 by Customs found it to be "quite effective on empty and lightly loaded trucks," but noted that the lack of transmission imaging limited its performance on loaded vehicles. Customs Ex. 35 at 1. The review listed several areas that needed to be improved, but concluded by stating that "[a]ll is not negative in this report," remarking that Customs had noticed surprising positive improvements over that which was expected. *Id.* at 2–3. A July, 1997 Customs document described Mobilesearch 1's ability to detect contraband in low density vehicles to be "favorable." AS & E Ex. 30 at 41. Mobilesearch 1 has been in use since March, 1997. *See* AS & E Ex. 258 at 2.

As for Mobilesearch 2, Customs undertook a critical design review as the MTXR was "nearing its final design." Customs Ex. 16 at 1. Although at the preliminary injunction hearing Customs' witnesses maintained that they were dissatisfied with the system's inability to scan certain portions of vehicles, this criticism was not made in the review of the system at the time. Customs currently uses Mobilesearch 2 in field operations.

### 2. *Mobilesearch 3 and 4*

In September, 1997, the Office of Special Technology of the Department of the

---

**3.** A white paper is a proposal submitted in response to a BAA or request for proposal.

**4.** The key advantage for a MTXR over a fixed truck x-ray system is the mobility the MTXR provides. Generally speaking, MTXRs are large trucks equipped with x-ray capabilities.

This allows them to deploy to different points of entry to detect contraband. The fixed truck x-ray systems, described as a "car wash" through which scanned vehicles pass, instead must remain at the point of entry where installed.

Navy, acting on behalf of Customs, awarded AS & E a sole source contract to produce two more MTXRs. The key improvement in the designs was the widening of the angle of the fan beams. *See* May 20, 1999 Tr. at 35. After finding the two MTXRs ("Mobilesearch 3" and "Mobilesearch 4") to be "acceptable," *see* AS & E Ex. 277, Customs took them for testing in December, 1998. Both have experienced reliability problems. *See* May 20, 1999 Tr. at 36–38; Customs Ex. 30; EG & G Ex. K. at 1. At the time of the hearing, Mobilesearch 3 was being serviced at AS & E facilities, while Mobilesearch 4 was deployed in the field.

### D. *The 1998 BAA*

In December, 1997, the United States Army issued BAA 98–001, seeking proposals for non-intrusive inspection technologies "using a systems approach, which are applicable to the examination of cargoes, vehicles, and other large and small containers for detection of illicit (illegal drug) materials without requiring manual inspection." [5] Admin. Rec. at 2.

AS & E responded to the BAA with three white papers, each suggesting improvements to its existing MTXRs. Though the proposals interested Customs, they did "not meet [Customs'] need to develop a new prototype mobile truck x-ray system," and the proposals were not pursued. AS & E Ex. 16.

EG & G submitted a white paper for the "Development of a Mobile Inspection System for the Interdiction of Contraband," its version of an MTXR having both backscatter and transmission capabilities, which it referred to as "MOBIX." [6] Admin. Rec. at 6. Among the proposed improvements to the current technology of MTXRs was MOBIX's "low undercarriage view"—a closer to the ground x-ray source which allowed for the scanning of the tires and other low sections of vehicles. Customs pursued the EG & G proposal, ultimately resulting in a contract between Customs and EG & G in November, 1998, calling for the manufacture of a prototype MTXR, with options to purchase more in the future. *See* Admin. Rec. at 469–508.

Customs' *primary* motivation in entering into the contract with EG & G was to develop a second source and create competition for MTXRs. *See, e.g.,* Admin. Rec. at 140 (stating the EG & G proposal "will further allow [Customs] to compete for future vehicles with multiple vendors"); *Id.* at 389 (finding the AS & E MTXRs and EG & G MTXRs to be "mission interchangeable," but stating "[t]he government's interest in developing a second source for this equipment, is to facilitate competition in future procurement actions"); *Id.* at 376 ("The government's interest in developing a second source for vehicles will allow us a competitive source bid for this equipment in the future, with significant budget savings."); *Id.* at 428 (same); *Id.* at 135 (announcing that it was Customs' "intent, through this award, to increase competition"); Customs Ex. 28 at 2 (identifying Customs' concern that "AS & E has been attempting to place the Government in a 'Single-source Financial Hostage' situation for future acquisition of all mobile truck X-ray type systems"); AS & E Ex. 21 (describing the "purpose of this [EG & G] prototype is to provide competition to the AS & E Mobile Truck X-ray"); *Id.* Ex. 228 at 1 (stating the requirement to be to "develop a second procurement source for the Mobile Truck X–Ray system"); *Id.* Ex. 17 at 3 ("Alternative source is needed with similar capability to the [AS & E] MTXR.").

### E. *AS & E, Dr. Annis and EG & G*

On July 27, 1993, AS & E terminated the employment of its Chief Executive Of-

---

5. The BAA went on to state "[p]rojects to be considered would include, but are not limited to, prototype development projects for individual inspection devices . . . [and] improvements to existing devices." Admin. Rec. at 2.

6. EG & G submitted a revised version of its MTXR proposal shortly thereafter. *See* Admin. Rec. at 5.

ficer, Dr. Martin Annis. Shortly thereafter, Dr. Annis established his own company, AnnisTech, Inc. ("AnnisTech"), an x-ray systems manufacturer and designer and a competitor of AS & E. Litigation followed, with Dr. Annis suing AS & E over his employment agreements, among other things, and AS & E counterclaiming for breach of fiduciary duty and misappropriation of trade secrets.

In 1994, AnnisTech signed a contract with the United States Army's Advanced Research Projects Agency ("ARPA") to manufacture a mobile x-ray inspection system employing both transmission and backscatter technology. In late 1994, AnnisTech subcontracted work to EG & G that required EG & G to create and supply a testbed and conveyer to be used in a mid–1995 collimation demonstration. for Customs. The goal of the collaboration was to prove to Customs the viability of an AnnisTech/EG & G system that could combine the two forms of x-ray imaging.[7]

Prior to its involvement with Dr. Annis, EG & G had never had "a serious backscatter project." May 19, 1999 Tr. at 14. In June, 1995, EG & G proposed to build for ARPA a cargo x-ray system equipped with both transmission and backscatter technology. At the time of the proposal, and indeed even shortly after the award of the contract in November of 1995, EG & G planned on using an AnnisTech "switch"[8] collimator in its system, provided that an acceptable licensing agreement could be reached between EG & G and AnnisTech. *See, e.g.,* May 19, 1999 Tr. at 98–99; AS & E Exs. 100, 105 at 12, 110 at 3, 115, 122 at 1, 124 at 1, 126 at 1.

In June, 1995, the Massachusetts Superior Court held valid and enforceable a provision in an employment agreement which gave AS & E the exclusive rights to all inventions made by Dr. Annis within one year after his July 27, 1993, termination.[9] *See id.* Ex. 87. AS & E notified Customs officials of the court's decision on July 13, 1995. *See id.* Ex. 95.

Further, in November, 1995, AS & E warned EG & G President Thomas Schorling that it believed Dr. Annis was misappropriating AS & E technology.[10] Very soon thereafter, Schorling allegedly instructed EG & G's Chief Scientist Dr. Paul Bjorkholm to attempt to design a collimator that allowed for the creation of both a transmission fan and backscatter pencil beam.[11] That same month, EG & G sub-

---

7. The relationship between EG & G and AnnisTech also contemplated other projects that could combine Dr. Annis' backscatter technology with EG & G's proven and reliable transmission systems. For example, AnnisTech and EG & G also discussed delivering an x-ray system to the United States Government for the 1996 Olympics in Atlanta.

8. A "switch" collimator allows a single x-ray source beam to alternate between a fan beam for transmission imaging and a pencil beam for backscatter imaging. Dr. Annis developed at least two types of switch collimators. The "switch" designs were among several collimators Dr. Annis designed around the time of his collaboration with EG & G. In late 1995 and early 1996, EG & G possessed at least one "rotating cylindrical collimator" designed by Dr. Annis and constructed by EG & G. *See* May 19, 1999 Tr. at 114.

9. In April of that same year, a jury also found that Dr. Annis had materially breached his fiduciary duties to AS & E.

10. AS & E sued EG & G in 1995, alleging a misappropriation of trade secrets stemming from the collaboration between AnnisTech and EG & G. The case was settled in August 1996 when EG & G advised AS & E that it was no longer dealing with AnnisTech and had returned all documents and models containing technical information. EG & G also informed AS & E that it was independently attempting to produce x-ray systems capable of both backscatter and transmission imaging.

11. Dr. Bjorkholm testified that he had virtually no knowledge of the AnnisTech/EG & G collaboration, including their joint research pertaining to collimator designs. However, it is worth noting that EG & G instructed ARPA personnel to submit any questions they had regarding the LineScan 232 system, which was to include a "switch" collimator, to Dr. Bjorkholm. *See* AS & E Ex. 121 at 2.

mitted a white paper to the government proposing a "Commercial Vehicle Inspection System" which would utilize a collimator designed to accomplish that goal. *See* AS & E Ex. 127. Unlike Dr. Annis' designs, which contained grooves in the edge of the rotating cylinder that allowed for the creation of a continuous pencil beam, the EG & G collimator contained a series of tunnels bored through the cylinder that allowed for a number of discrete beams to pass through to the scanned object. The numerous discrete beams, taken together, created the equivalent of a continuous beam. This EG & G collimator is the basic collimator design that will be utilized in EG & G's MTXR.

In October, 1996, the Massachusetts Superior Court found that Dr. Annis was using AS & E trade secrets, including collimator designs, in his proposals for the ARPA project, and preliminarily enjoined him from doing so. In November, 1996, AS & E and AnnisTech settled their case when Dr. Annis conceded that the majority of the technology he hoped to use in the ARPA project, including the various collimation devices, were proprietary to AS & E. AS & E summarized the settlement for Customs in June, 1997. *See* AS & E Ex. 186.

### F. *Publicly Disclosed Backscatter Technology*

United States Patent No. 4,745,631, issued May 17, 1988, to Paolini (and assigned to North American Philips Corp.) described an x-ray system that created a "flying spot" beam to scan objects. The Paolini patent described a collimator as "a rotating cylinder having even numbers of helical slots." EG & G Ex. AM at 1. The collimator appears very similar to an earlier AS & E collimator design known as a "Harootian" collimator.

United States Patent No. 5,181234, issued January 19, 1993, to Smith (and assigned to IRT Corp.) claims an x-ray backscatter detection system that creates a

"pencil beam" for backscatter imaging. *See id.* Ex. AH at 1. The collimation device, a so-called "chopper wheel" collimator, is a flat, circular, rotating plate with four portions cut out to intermittently allow for the passage of the pencil beam to the scanned object. *See id.* at 2. The collimator is similar to an AS & E designed "chopper wheel" collimator pictured in a 1987 article on backscatter x-ray imaging. *See id.* Ex. AW at 4. Other patents describing x-ray systems which utilize a similar type "chopper wheel" collimator include United States Patent No. 5,302,817, issued April 12, 1994, to Yokota, et al., (and assigned to Kabushiki Kaisha Toshiba) that employs backscatter and pencil beam technology to scan baggage, and United States Patent No. 3,808,444, issued April 30, 1974, to Schneeberger et al. (and assigned to Westinghouse Electric Corp.). *See id.* Exs. AR, AQ.

AS & E itself owns patents issued prior to 1995 that describe backscatter and/or flying spot technology.[12] *See id.* Ex. U at Bates No. 001293 (describing a form of x-ray imaging with backscatter and flying spot technology); AS & E Ex. 40 (seeking a continuation of the previous patent); EG & G Ex. AL at 4–8 (listing various AS & E patents). Dr. Annis or Dr. Bjorkholm were responsible for many of the processes or systems claimed in the patents.

In September, 1994, Dr. Annis, on behalf of AnnisTech, filed an application for a patent that possessed a rotating cylindrical collimator used to create a pencil beam; the patent was issued in June, 1996. *See id.* Ex. AS. Dr. Annis also filed a patent application in July, 1995, for a backscatter inspection system that created pencil beams by using an edge-lit rotating cylindrical collimator. *See* AS & E Ex. 161.

In addition, various non-proprietary publications discussed backscatter imaging in the years prior to 1995. *See, e.g.,* EG & G Ex. AX; *id.* Ex. AY; *id.* Ex. E.

---

12. AS & E has recently received patents which incorporate backscatter and pencil beam technology, *see* EG & G Ex. AP at Bates No. 1030; *Id.* Ex. BE, the latter being a patent on AS & E's MTXR design.

## II. Conclusions of Law

In order to succeed on a motion for a preliminary injunction, a party must prove: "(1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) a favorable balance of the hardships; and (4) a fit (or, at least, a lack of friction) between the injunction and the public interest." *EEOC v. Astra, U.S.A., Inc.,* 94 F.3d 738, 742 (1st Cir.1996). Of these factors, the most essential is a demonstration by the moving party that it is reasonably likely to succeed on the merits of a claim on which the prayer for injunctive relief is based. *See, e.g., Philip Morris, Inc. v. Harshbarger,* 159 F.3d 670, 674 (1st Cir.1998) ("Likelihood of success is the touchstone of the preliminary injunction inquiry."); *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 16 (1st Cir.1996) (likelihood of success is the "main bearing wall of the four-factor framework"); *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993) (likelihood of success is the "*sine qua non* of that formulation").

### A. The Procurement Issue

 When assessing objections to federal contracts or procurements, courts must review the particular agency's decision pursuant to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.[13] *See* 28 U.S.C. § 1491(b)(4). The APA allows district courts to:

> overturn federal administrative actions that are arbitrary and capricious, an abuse of discretion, or reflect a failure to comply with applicable laws or regulations. When the review concerns

Government procurement contracts, a 'disappointed bidder on a government contract must show that the decision by the government agency *either had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations.*'

*Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052, 1054 (1st Cir.1987)(emphasis added) (quoting *Smith & Wesson v. United States,* 782 F.2d 1074, 1078 (1st Cir.1986)); *see also Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Authority,* 977 F.2d 1472, 1478 (D.C.Cir.1992); *Newport News Shipbuilding and Dry Dock Co. v. General Dynamics Corp.,* 960 F.2d 386, 392 (4th Cir.1992).

 AS & E's primary contention is that the manner in which Customs entered into the EG & G MTXR contract—through a BAA—was a non-competitive procurement in violation of CICA. As noted above, a BAA satisfies CICA's full and open competition requirements only in limited circumstances. Of particular importance here is the requirement that the BAA be used only for the "selection of basic and applied research and that part of development not related to the development of a specific system or hardware procurement." 48 C.F.R. § 6.102(d)(2). Thus, only when what is procured through the BAA is either basic research, applied research or development "not related to the development of a specific system or hardware procurement" will the process be considered competitive.

The FAR defines "basic research" as:

> research directed toward increasing knowledge in science. The primary aim

---

**13.** Typically a court's review will be confined to the administrative record that existed at the time of the agency decision. *See Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 460 (1st Cir.1989). Evidence outside the record may be looked to, however, "in cases where relief is at issue, especially at the preliminary injunction stage," and "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly." *Esch v. Yeutter,* 876 F.2d 976, 991

(D.C.Cir.1989). Both circumstances existed here, and the Court took evidence beyond the administrative record. While a court generally defers to agency interpretations of its own regulations, it need not do so if the regulatory scheme and the questions under review are within the competence of the reviewing court. *See Choctaw Mfg. Co. v. United States,* 761 F.2d 609, 619 n. 17 (11th Cir.1985); *Action Serv. Corp. v. Garrett,* 790 F.Supp. 1188, 1193 (D.P.R.1992).

of basic research is a fuller knowledge or understanding of the subject under study, rather than any practical application of that knowledge.[14]

*Id.* § 35.001.

From this, it is clear that the EG & G MTXR was not "basic research." The contract's central goal was not to compile data and information on backscatter and transmission imaging for the sake of increased scientific knowledge. It was awarded strictly with practical applications in mind: to fund the creation of a specific MTXR that could function as a second source for future MTXR procurements.

For similar reasons, the subject of the procurement was not "applied research" either.[15] Stated simply, the EG & G MTXR contract was not "research" at all. *See* Admin. Rec. at 336 (noting that "the proposed technology is not new, just the assembly of known technology"); *id.* at 147 (similar); *id.* at 375 (describing the EG & G MTXR as "an equivalent vehicle" to the already existing AS & E MTXRs). The contract was for the production of a specific type of mobile x-ray system. Its detailed specifications and requirements were established by the statement of work. Arguably, MOBIX will incorporate features that advance "the state of the art" in some degree, but this fact alone does not mean that the EG & G MTXR is the product of "applied research." If that

were so, any contract for a product with almost *any* design differences from existing products could be classified as applied research.

Rather, the EG & G MTXR falls within the FAR definition of "development."[16] The contract related to the development of a specific system or hardware procurement, specifically, a distinct type of MTXR. The fact that the contract only called for the production of a prototype is of no consequence. *See* 48 C.F.R. § 35.001. It is still a contract for the procurement of a product. *See also Rapides Regional Medical Center. v. Secretary, Dep't of Veterans' Affairs,* 974 F.2d 565, 573–74 (5th Cir.1992) ("[T]here can be little doubt that the word procurement is widely understood, by lawyers and laymen alike, to denote the process by which the government pays money or confers other benefits in order to obtain goods and services from the private sector.").

At this stage, findings and conclusions are necessarily provisional. On the present record, the Court concludes that AS & E has shown that the use by Customs of a BAA to procure EG & G's MOBIX system was a non-competitive method of procurement in violation of the "full and open competition" requirement of CICA.

This conclusion, however, does not mean that AS & E is likely to succeed on the

---

14. The legislative history of CICA recognizes that basic research "is directed toward increasing knowledge of a subject apart from any clear or necessary practical application of that knowledge." H.R. Conf. Rep. No. 98–861, at 1423 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 2111.

15. The FAR defines "applied research" as:

> the effort that (a) normally follows basic research, but may not be severable from the related basic research; (b) attempts to determine and exploit the potential of scientific discoveries or improvements in technology, materials, processes, methods, devices, or techniques; *and* (c) attempts to advance the state of the art.
> 48 C.F.R. § 35.001 (emphasis added).

All three criteria must be satisfied for an award to be one for "applied research."

16. The FAR defines "development" as:

> the systematic use of scientific and technical knowledge in the design, development, testing, or evaluation of a potential new product or service (or of an improvement in an existing product or service) to meet specific performance requirements and objectives. It includes the functions of design engineering, prototyping and engineering testing; it excludes subcontracted technical effort that is for the sole purpose of developing an additional source for an existing product.
> 48 C.F.R. § 35.001.

The EG & G contract is for a prototype. It is not "subcontracted technical effort," and accordingly still falls within the definition of development despite its purpose of developing an additional source.

merits of its claim against Customs in this litigation. The fact that Customs violated the statute does not necessarily entitle AS & E to the relief it seeks. To justify setting aside a government procurement contract, a plaintiff must prove either the agency's decision had "no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations." *Ulstein Maritime, Ltd.,* 833 F.2d at 1054; *Smith & Wesson,* 782 F.2d at 1078.

■ The Customs decision to award the MTXR contract to EG & G had a rational basis in fact. The record demonstrates that Customs believed the BAA to be a competitive, legally acceptable method of procuring an MTXR contract with EG & G. *See* Admin. Rec. at 135 (summarizing research into the legality of the procurement); AS & E Ex. 21 (requesting an opinion on the legality of using the BAA to procure the EG & G MTXR contract); Customs Ex. 41 (discussing past contracts procured under a BAA). Despite AS & E's assertions of a secret conspiracy, there exists scant evidence of bad faith or intentionally improper behavior.[17]

Furthermore, Customs' violation of CICA was not legally prejudicial to AS & E. As noted, Customs' primary motivation for the EG & G contract award was to develop a second source and create competition in the MTXR field. But what that means is that Customs wanted a contract with a source *other than AS & E.* In other words, AS & E was not deprived of the opportunity to be awarded this contract, because *this* contract was going to be awarded to any qualified bidder *but* AS & E.

Besides, Customs could probably have reached the same result by another lawful route. CICA permits government agencies to exclude a source, such as AS & E, from participation in a procurement in or-

der to establish an alternative source or supply. *See* 41 U.S.C. § 253(b). An agency may conclude that it would increase competition or lower future procurement costs to exclude a given vendor from bidding and make a formal determination and finding to that effect. *See* 41 U.S.C. § 253(b)(1); 48 C.F.R. §§ 6.201, 6.202(b)(1). The record indicates that Customs could plausibly have made a determination and finding that excluding AS & E would ultimately increase competition by developing other sources for MTXRs. That is, in fact, what the relevant Customs officials repeatedly wrote in internal memos. Further, once AS & E had been excluded, Customs could have simply put out a request for a proposal seeking an MTXR with backscatter and transmission capabilities. Since other than AS & E it appears that only EG & G is a potential provider of such an x-ray system, the end result—an MTXR contract for EG & G—would have been the same. In providing a remedy for procedural violations, courts should attempt to place "the successful plaintiffs ... back in the position they would have occupied but for the illegal agency actions." *Ulstein Maritime, Ltd.,* 833 F.2d at 1059; *see also Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 206–07 (D.C.Cir. 1984); *Action Serv. Corp. v. Garrett,* 790 F.Supp. 1188, 1196 (D.P.R.1992).

AS & E may argue that it has been prejudiced in the sense that now there exists competition for MTXRs where there had been none before Customs awarded the contract to EG & G. First, the government could have lawfully produced this same result. More to the point, it is not a goal of CICA to protect vendors from competition, but rather to subject them to it.

Finally, the public interest also militates against injunctive relief. An injunction

---

**17.** "[G]overnment officials are presumed to act in good faith. Plaintiff must present well-nigh irrefragable proof of bad faith or bias on the part of government officials in order to overcome this presumption." *China Trade Center, L.L.C. v. Washington Metropolitan Area Transit Authority,* 34 F.Supp.2d 67, 70–71

(D.D.C.1999) (internal citations and quotations omitted). AS & E's failure to overcome this heavy burden of proof warrants a denial of injunctive relief on its claim of "inevitable" trade secret disclosure. The record does not lead to the conclusion that Customs has violated or will violate the Trade Secrets Act.

will delay the production of an x-ray system that may assist Customs officials to detect illegal narcotics and weapons. Preliminary relief would also produce additional costs and expenditures that would ultimately be borne by the public.[18] While the public certainly has an interest in having governmental agencies comply with the law, not all violations are of sufficient moment to overcome significant security and fiscal considerations, especially where there has not been recognizable prejudice from Customs' non-compliance.[19]

### B. The Trade Secret Issue

AS & E argues that EG & G has misappropriated AS & E trade secrets for use in the EG & G contract with Customs, particularly with respect to the collimator to be used in the EG & G MTXR. Under the plaintiff's theory, Dr. Annis' mid–1990s collimator designs were AS & E trade secrets. After leaving AS & E, Dr. Annis collaborated with EG & G on backscatter projects that included collimator design discussions. Prior to this, EG & G had no serious backscatter projects. The natural inference, it argues, is that Annis disclosed AS & E trade secrets. According to AS & E, when EG & G realized that as a result of the Massachusetts state court litigation Dr. Annis' designs were going to be deemed AS & E trade secrets, EG & G created a copycat design based upon information Dr. Annis had shared with it. The EG & G collimator that resulted was designed to *appear* to have been derived independently.

Massachusetts law defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Eastern Marble Products Corp. v.*

*Roman Marble, Inc.,* 372 Mass. 835, 364 N.E.2d 799, 801 (1977), *quoting Restatement (First) of Torts* § 757 cmt. b (1939); *see also CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 850 (1st Cir.1985). In determining whether information qualifies as a trade secret, courts should consider:

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 282 N.E.2d 921, 925 (1972). "The cornerstone of a trade secret ... is secrecy." *CVD, Inc.,* 769 F.2d at 850; *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 260 N.E.2d 723, 730 (1970). A trade secret that enters the public domain strips its owner of the exclusive rights to the information. *See J.T. Healy & Son, Inc.,* 260 N.E.2d at 730; *see also Moore v. Marty Gilman, Inc.,* 965 F.Supp. 203, 217 (D.Mass.1997) (finding that information already in the public domain cannot be a trade secret).

On the present record, the Court is unconvinced that the EG & G collimator is derived from trade secrets belonging to AS & E. One major difficulty with AS & E's theory is its vagueness and lack of specificity. After a thorough review of both the exhibits and the testimony, the

---

18. Were the Court to grant an injunction for a violation of CICA, Customs could simply re-award the same contract to EG & G, this time utilizing the proper procurement procedures. In light of this possibility, injunctive relief would not only waste money but also elevate form over substance. *See ATA Defense Indus. v. United States,* 38 Fed. Cl. 489, 499 (1997).

19. This denial of a preliminary injunction should not be understood to minimize the importance of an agency's compliance with appropriate procurement regulations. The Court admonishes Customs to take care to play within the rules in the future.

Court is still unclear as to exactly what "trade secrets" were allegedly misappropriated.

Backscatter technology itself is not exclusive to AS & E, nor is the concept of using a rotating cylindrical collimator to produce a "flying spot." [20] For many years prior to the Annis/EG & G collaboration, other companies manufactured products employing one or both of these technologies. *See, e.g.,* EG & G Ex. AM (identifying a rotating cylindrical collimator similar to the AS & E Harootian-designed collimator that produces a flying spot); *id.* Ex. AH (patenting a backscatter detection system whose "chopper wheel" collimator creates a pencil beam); *see also supra* § I(F), at 12. AS & E patents themselves further instructed the public on backscatter technology. *See supra* § I(F), at 12. Neither backscatter nor rotating cylindrical collimators generally can be classified as AS & E trade secrets.

The plaintiffs have not proven that the "Annis switch" is its trade secret either. That AS & E may have provided such evidence in the 1994 Annis litigation does not excuse it from providing it here. It appears that when Dr. Annis left AS & E, the switch was not more actual than an idea existing in his mind to be created at a later date. Perhaps the idea derived from AS & E trade secrets; perhaps it did not. If it did, AS & E has not told the Court how. The record simply does not provide this information, and accordingly, the Court cannot find at this stage that the "switch" ought to be classified as an AS & E trade secret meriting protection.[21]

Moreover, even if Dr. Annis *did* misappropriate trade secrets, it does not follow that EG & G knew that this is what he was doing. The proffered evidence is just as consistent with a finding that EG & G was an innocent beneficiary of trade secret information as it is with a finding that it knew that what Dr. Annis was passing along was protected.

In sum, on the present record, AS & E has failed to show a likelihood of success on its trade secrets claim, and injunctive relief will not be granted.

### III. Conclusion

For the reasons set forth above, AS & E's motion for a preliminary injunction is DENIED.

It is SO ORDERED.

---

**20.** AS & E claims that the EG & G collimator copies the design of the "Harootian" collimator, so named after an AS & E employee who proposed its design when Dr. Annis was at AS & E. AS & E never built this collimator, and believes that the design is inferior to its other methods of producing "flying spots." The "Harootian" design therefore is not used in AS & E's business, and is not something which gives AS & E an advantage over competitors who do not know of the design. It is difficult to see how something AS & E does not use and which it believes likely would not work well could qualify for trade secret protection. Further, the Paolini patent depicts a very similar rotating cylindrical collimator.

Finally, AS & E has not established how EG & G's current collimator design is sufficiently similar such that this Court could conclude that it was substantially derived from the Harootian collimator.

**21.** AS & E seems to assume that because Dr. Annis acknowledged that the switch fell within his employee agreement as proprietary to AS & E, this Court must classify it as a trade secret. Even if the switch, when actualized, was a design AS & E could derive an economic benefit from, it does not necessarily mean that the *Restatement* test for trade secrets has been satisfied.